**GREYHOUND LINES, INC., and the Greyhound Corporation, Plaintiffs,**

v.

**UNITED STATES of America, and Interstate Commerce Commission, Defendants,**

**the Public Utility Commissioner of Oregon, Intervening defendant,**

**Mt. Hood Stages, Inc., Intervening Defendant.**

**No. 69 C 1148.**

United States District Court
N. D. Illinois, E. D.
June 27, 1969.

Amos M. Mathews, Robert J. Bernard, Chicago, Ill., for plaintiffs.

Thomas A. Foran, U. S. Atty., Chicago, Ill., for The United States and I. C. C.

Masuda, Spivack & Funai, Chicago, Ill., and Thomas Y. Higashi, Asst. Atty. Gen., State of Oregon, Salem, Or., for The Public Utility Commissioner of Oregon.

Eugene L. Cohn, Chicago, Ill., and Donald A. Schafer, Portland, Or., for Mt. Hood Stages, Inc.

### MEMORANDUM AND ORDER

ROBSON, District Judge.

The plaintiffs have moved for a temporary restraining order. For the reasons set forth below, this court is of the opinion that the motion should be denied at this time.

The plaintiffs, Greyhound Lines, Inc. and The Greyhound Corporation (Greyhound), have acquired over the last several years, eight bus companies operating in the Pacific Northwest. These eight companies "virtually encircle" the route run by the intervenor Mt. Hood Stages, Inc. (Mt. Hood) from Klamath Falls to Biggs, Oregon, a distance of about 278 miles. Greyhound had an agreement with Mt. Hood from 1949 to 1964, to use Mt. Hood's route to and from Klamath Falls as a through bus. In 1964, Mt. Hood suspended operations because of a strike. Greyhound rerout-

ed its buses on an all-Greyhound route through Portland, Oregon, a distance of about 390 miles, or over 110 miles and three hours longer than the Mt. Hood route.

When the strike was over at Mt. Hood, Greyhound notified Mt. Hood that it was exercising its 60-day cancellation option and would operate its own all-Greyhound Portland route. In December, 1964, Mt. Hood filed its first petition before the Interstate Commerce Commission, which ultimately formed the basis of the instant suit. At all stages of the proceedings before the I.C.C., Greyhound's contentions that the I.C.C. had no jurisdiction under 49 U.S.C. § 5(9) were overruled, twice by the entire Commission, acting unanimously.

The I.C.C. based its rulings that Greyhound should reinstitute the Mt. Hood through-bus service on certain representations Greyhound made in the prior eight acquisition proceedings. Greyhound represented that it would, *inter alia*, retain the Mt. Hood service and continue to quote Mt. Hood rates, times, etc., to Greyhound passengers. In its reply brief on this motion, Greyhound argues that they should not be bound by those representations (which it admits were made), since the representations "were stated in the present tense and plainly were not meant to apply inflexibly to situations that might arise years later." Reply Brief, at 3. However, one of the grounds of the present decision of the I.C.C. was that the public interest would be served by the continued existence of the Mt. Hood through-bus service with Greyhound. The presence of the Intervenor Public Utility Commissioner of Oregon and his opposition to this motion are further evidence of the public interest involved here.

■ In order for this court to grant a temporary restraining order under 28 U.S.C. § 2284(3), it must find that without the order there will be "irreparable damage" to the movant. The order, according to the statute "shall contain a specific finding, based upon evidence submitted to such judge and identified by reference thereto, that specified irreparable damage will result if the order is not granted." Several cases have added to this requirement of irreparable harm, a requirement that the movant show that it has a "reasonable possibility" of prevailing on the merits. *E. g.*, Tennessee Public Service Commission v. United States, 275 F.Supp. 87, 90 (W. D.Tenn.1967). However, without a showing of irreparable harm, no matter how reasonable the possibility that the movant might prevail on the merits, a temporary restraining order should not issue. 28 U.S.C. § 2284(3).

■ Assuming for the purposes of argument that Greyhound has met this light burden of proof of showing that it has a reasonable possibility of prevailing on the merits, this court must first and foremost investigate Greyhound's claims of irreparable injury. The affidavit of Weldon M. Beeler, vice president for traffic in the Greyhound organization, shows that the average passenger load per bus on the Mt. Hood line (before 1964) was approximately 21 to 23 passengers per bus. In 1965, on the Portland route of the Greyhound, the passenger load was 29.2; in 1966, 30.0; in 1967, 27.9; and, in 1968, 24.5; for an average of 28.0 passengers per Portland bus during the years 1965–1968, the years immediately following Greyhound's cancellation of the Mt. Hood contract. Mr. Beeler asserts that this route through Portland is more profitable than the Mt. Hood route, and that there is not enough traffic to support two routes. Compliance with the I.C.C. order, continues the affidavit, would mean that Greyhound would either have to abandon its Portland route, or operate the Portland route in competition with the Mt. Hood route. All these factors, contends Greyhound, constitute irreparable injury.

But Greyhound has not presented any figures showing how and in what manner they will suffer "specified irreparable damage," as demanded by Section

2284(3). It appears clear that Greyhound will not show a loss by reinstituting the Mt. Hood through-bus. All that might happen is that Greyhound might make a somewhat smaller, though completely unspecified amount of profit. But this is contested by the data set forth by Mt. Hood, and by the court's own calculations.

Greyhound's average cost on its routes is about 70 cents per bus mile. If we multiply this figure by the distance on the Portland route (390 miles), we arrive at an estimated operating cost on this run of about $265. Multiplying this figure by the 28-passenger figure per bus averaged over the last four years, we reach a revenue figure (assuming three cents per mile per passenger) of $315, or about $40 over cost. If the more relevant figure of 24.5 passengers per bus is used, the average for 1968, Greyhound's revenue is cut to only about $286, or only $21 over cost.

If we compare these cost figures with the Mt. Hood route, there are some surprising results. Mt. Hood previously paid Greyhound about 20 cents per bus mile as a fee for leasing the buses. Since the distance over the Mt. Hood route is about 278 miles, this means an added $55.60 in revenue to the Greyhound. Add to this the saving of 112 miles (and the consequent reduction in payment for drivers at 20 cents a mile) and the saving of about three hours travel time, it appears to this court that, even if Greyhound discontinues the Portland route, it could conceivably make as much, if not more profit on the Mt. Hood run, even given the two or three passenger reduction per bus, according to the 1968 statistics presented by Greyhound. This is far from "irreparable" damage.

■ In addition, this court must consider the impact of a temporary restraining order on Mt. Hood and on the general traveling public. Although one case has said that there can be no balancing of the equities in considering a temporary restraining order under Section 2284(3), Tennessee Public Service Commission v. United States, *supra*, this court is of the opinion that the general equitable nature of this type of injunction order and the better reasoning in other cases show that a balancing of the equities is not only desirable, but necessary. *E. g.*, Cincinnati, New Orleans & Texas Pacific Railway Co. v. United States, 220 F.Supp. 46, 48 (S.D.Ohio, 1963); Campbell Sixty-Six Express, Inc. v. United States, 253 F.Supp. 613, 615 (W.D.Mo.1966). *Cf.* Stott v. United States, 154 F.Supp. 389 (S.D.N.Y.1957).

Mt. Hood has submitted the affidavit of its president and owner, William Niskanen. He states that Mt. Hood is losing about $700 each day, and, for the first five months of 1969, has suffered an operating loss already of about $100,000. Greyhound correctly stated at the hearing that, in 1966, after the cancellation of the contract, Mt. Hood's revenues rose. However, as the brief for Mt. Hood points out, this was the year of strikes against several airlines and a strike against Greyhound. Since that time, Mt. Hood's revenues have declined substantially. In addition, revenues for 1965 declined by $96,000 over the revenues in the last contract year of 1964.

Greyhound contends that Mt. Hood's belonging to the National Trailways organization, Greyhound's principal competitor, shows that its cries of loss of revenue should not be weighed very heavily. However, the nature of the Trailways' organization is vastly different from that of Greyhound's corporate setup. The National Trailways Bus System is "a voluntary, *nonprofit* association of some 44 motor common carriers of passengers, formed in 1936 for the purpose of promoting travel over their lines, improving their service, effecting economies in operation, and fostering safety practices, through the establishment of joint terminals, coordination of schedules, transportation of passengers with minimum interchange of buses, joint advertising of service, joint purchase of supplies and use of

common color schemes and trademarks." (Emphasis added) Mt. Hood Stages, Inc., Petition for Modification—Greyhound Mergers (Western Division), 104 M.C.C. 449, 464–465 (Division 3, 1968), Exhibit A, Complaint. It does not appear, nor does Greyhound suggest, that there would be any financial help forthcoming from Trailways. In any event, even if Trailways did assist monetarily, the damage to Mt. Hood is still quite substantial and would not alter this court's opinion as to the propriety of granting a temporary restraining order.

Mr. Niskanen's affidavit quotes some very relevant portions of the I.C.C. staff's Division 3 opinion. That opinion states, *inter alia*, that Greyhound's cancellation of the contract and subsequent revision of time schedules "were inspired by a desire to stifle competition," and that "Greyhound has created a situation which is no longer consistent with the public interest because it deprives passengers of the best available service." The I.C.C. itself, in unanimously affirming the Division 3 order, concluded that the order should go into effect "without unreasonable delay which may cause petitioner (Mt. Hood) irreparable damage." This order was effective January 15, 1969, but Greyhound by filing another petition for reconsideration, which was ultimately denied, delayed the final entry of the order to April 14, 1969. This suit was filed on May 27, 1969, but Greyhound waited until the end of June before moving for this temporary restraining order, thus delaying the final decision on the merits even further.

■ Greyhound further contends that if it is forced to comply with the I.C.C. order, it might lose its chance for judicial review on the ground that the case might be moot. In support of this contention, Greyhound cites American Book Co. v. State of Kansas ex rel. Nichols, 193 U.S. 49, 24 S.Ct. 394, 48 L.Ed. 613 (1904). This case, however, did not deal with the situation confronting this court. Here we have a clear statutory right of judicial review by a three-judge federal court, and it is quite often the case that an I.C.C. order would be in effect, absent a temporary restraining order, before a decision on the merits could be rendered. See 28 U.S.C. § 2324. It is therefore clear that, even though the I.C.C. has made provision for what it termed "voluntary" compliance, Greyhound will not be prejudiced thereby, since compliance is "voluntary" in name alone, and not in fact. To the extent that this court can protect Greyhound's right to judicial review, this court will specifically include in its order that such conduct by the Greyhound in compliance with the orders of the I. C.C. shall not prejudice Greyhound's right to review of those orders.

■ Greyhound further argues that an injunction should issue to preserve the status quo. It is true that this is one factor that this court should weigh in deciding whether or not a temporary restraining order should be entered. *E. g.*, Cincinnati, New Orleans & Texas Pacific Railway Co. v. United States, supra. Even though the present status quo has been in effect over four years, the fact that Mt. Hood has been suffering serious losses as a result of Greyhound's cancellation, more than outweighs the effect to be given the status quo. Mt. Hood attempted to alter Greyhound's decision immediately after the cancellation, but it has taken more than four years to reach the present stage of this case. It is this court's opinion that the delay should end here.

It is therefore ordered that the motion of plaintiffs Greyhound Lines, Inc. and The Greyhound Corporation for a temporary restraining order be, and it is hereby denied.

It is further ordered that whatever actions plaintiffs take in compliance with the orders of the Interstate Commerce Commission pending decision by the three-judge court to be convened in this case be, and they are hereby deemed not prejudicial to plaintiffs' rights of judicial review.