**Nicholas A. PALMIGIANO et al.**

v.

**Anthony P. TRAVISONO et al.***
**Civ. A. Nos. 4296, 4348.**

United States District Court,
D. Rhode Island.
Aug. 24, 1970.

* Subsequent to the institution of this action, under a reorganization of the R.I. Department of Social Welfare, Mr. John P. Affleck, Director of the Department of Social and Rehabilitative Services, was substituted for Mr. Travisono as a party defendant, pursuant to Fed.R.Civ.P. 25 (d), and therefore subsequent proceedings will bear his name.

Hayden C. Covington, Barrington, R. I., Cary J. Coen and Barry A. Fisher, R. I. Legal Services, Inc., Providence, R. I., and Stanley A. Bass, N. A. A. C. P. Legal Defense and Educational Fund, Inc., New York City, for plaintiffs.

Herbert F. DeSimone, Atty. Gen., and Donald P. Ryan, Asst. Atty. Gen., Edward F. Burke, Ira L. Schreiber, Dept. of Social Welfare, Providence, R. I., for defendants.

## OPINION

PETTINE, District Judge.

### STATEMENT OF THE CASE

These actions were instituted by six inmates in the "awaiting trial" section of the Adult Correctional Institutions of Rhode Island (A.C.I.), in behalf of themselves and all others who are awaiting trial against eleven named defendants, all of whom are state or federal officials responsible for the custody and care of persons confined in the awaiting trial section of the A.C.I.[1] Jurisdiction has been invoked under 28 U.S.C. § 1343 (3) and (4) (1964). Relief is sought under 28 U.S.C. § 1361 (1964) against those defendants who are federal officers, and under 42 U.S.C. § 1983 (1964) and related provisions[2] against the defendants who are state officials. The plaintiffs pray for declaratory,[3] injunctive, and other appropriate relief against the enforcement of certain state statutes, regulations and customs relating to the care and treatment received by them in the awaiting trial unit.

The A.C.I. operates as several institutions in one, and one section, the unit in which plaintiffs are housed, constitutes what in most states would be known as a county or city jail. Because of the compactness of the State of Rhode Island and the ready accessibility of the A.C.I. from any point within the state, this single, centralized correctional facility is used as a pre-trial detention center as well as a post-conviction adult correctional institution. or penitentiary. It should also be pointed out that, under 18 U.S.C. § 4002 (1964), the federal government may enter into contractual arrangements with state authorities for the maintenance and safekeeping of federal prisoners, including those awaiting trials in federal courts. This explains the inclusion of federal prisoners as parties plaintiff and federal officials as parties defendant in this action.

The plaintiffs have asserted that they have been discriminated against in various ways as inmates of the awaiting trial unit. As an example of the alleged discriminatory practices, plaintiffs claim that they are not eligible for certain rehabilitative programs and services unless and until they plead guilty or are convicted and are transferred to another section of the A.C.I. Plaintiffs also allege that they have suffered deprivations of constitutional rights in common

---

1. The defendants include Anthony P. Travisono, Director of the Department of Social Welfare of Rhode Island; John Sharkey, Assistant Director of the Department of Social Welfare for Correctional Services; Francis Howard, Warden of the A.C.I.; Robert Black, Chief Classification Officer of the A.C.I.; William Martin, Bail Commissioner of the A.C.I.; Herbert F. DeSimone, Attorney General of Rhode Island; Judge John Mullen, Presiding Justice of the Superior Court of Rhode Island; Frank Licht, Governor of Rhode Island; Peter Foley, United States Marshal for Rhode Island; Myrl Alexander, Director, United States Bureau of Prisons; and John Mitchell, Attorney General of the United States.
The Attorney General of the United States, the Director of the Bureau of Prisons, and a United States Marshal were joined in this action, presumably, because custody and care of persons awaiting trial for federal criminal offenses or awaiting commitment to federal correctional institutions is vested in these officials. *See* 18 U.S.C. §§ 4086, 4008, 4006, 4042, and 4041 (1964). The Director of the Bureau of Prisons has been empowered by Congress to enter into contracts with state authorities for the safekeeping, care and subsistence of federal prisoners. 18 U.S.C. § 4002 (1964).
Myrl Alexander, one of the above-named defendants, has recently retired as Director of the United States Bureau of Prisons and a new Director, Norman Carlson, has been appointed. However, since it will not be necessary to grant relief upon this motion for a temporary restraining order against the Director of the Bureau of Prisons, for reasons to be explained later in this opinion, no amendment or substitution to include the new Director as a party will be necessary at this time.

2. Plaintiffs also seek relief under 42 U.S.C. §§ 1981, 1982, and 1985(3) (1964).

3. *See* 28 U.S.C. § 2201 (1964).

with inmates of other units of the A.C.I. For instance, they allege that tables in the dining area are unclean; that they are not given sufficient supplies for personal cleanliness; that restrictions on visitations with outsiders are unduly severe; and that the current practices of institutional officials in opening, reading and censoring mail are unconstitutional.

Plaintiffs requested that a three-judge court be impanelled.[4] The request was granted on July 3, 1970,[5] and a hearing on the merits on all issues in the case has been scheduled to begin early in 1971. On July 8, 1970, plaintiffs filed a motion for a temporary restraining order pending the hearing on the merits. In this motion are presented many of the same issues which are involved in the case of chief. The seriousness of the allegations made concerning censorship of mail, including alleged infringement of the "preferred" rights [6] contained in the First Amendment, interference with the right to the effective assistance of counsel in preparation for trial under the Sixth [7] and Fourteenth [8] Amendments to the Constitution, and denial of free access to the courts,[9] has impelled me to consider those portions of the motion for temporary restraining order pertaining to such censorship, and to defer all other questions to the entire court of three judges. I so advised counsel, and an evidentiary hearing has been held and arguments heard regarding censorship of mail.

## ALLEGATIONS OF PLAINTIFFS CONCERNING MAIL CENSORSHIP

Plaintiffs contend that defendants arbitrarily, capriciously, and without good cause or reason related to the maintenance of order at the A.C.I., persist in opening, reading and censoring plaintiffs' incoming and outgoing mail, including correspondence with courts, government officials, and attorneys. Among other things, they claim that opening and censoring of mail constitutes an invasion of a constitutionally-guaranteed right of privacy, that it constitutes an intrusion upon the attorney-client privilege, and that it hampers preparation for trial. They assert, further, that the actions of prison officials have placed a "chilling effect" upon their right of access to the courts, upon their right to petition representatives or agents of government, and upon their right to effective representation by counsel. They claim that the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments are being violated by defendants. Plaintiffs seek an order restraining defendants from delaying, opening, reading, censoring or tampering in any way with plaintiffs' incoming or outgoing mail.

## FINDINGS OF FACT

Although the opinions of the respective parties to this action concerning the necessity for censorship vary widely, the facts, as presented at the evidentiary hearing, are uncontradicted in any substantial or material respect.

1) Prisoners in the A.C.I., both state and federal, are housed in a separate unit or section while awaiting trial. The inmates of the awaiting trial section are, for the large part, persons who have been unable to afford bail. Although the A.C.I. is divided into several units or sections, its administration is central-

4. The request was made under 28 U.S.C. §§ 2281, 2282 and 2284 (1964).

5. The request was granted by Chief Judge Bailey Aldrich of the United States Court of Appeals for the First Circuit.

6. See, e. g., Jackson v. Godwin, 400 F.2d 529, 541 (5th Cir. 1968). The provisions of the First Amendment which plaintiffs claim are infringed by prison authorities in this case are the guarantee of free speech and the right to petition for redress of grievances.

7. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

8. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

9. See, e. g., Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1940).

ized and in many of its aspects it is operated as a single institution. For example, the rules, procedures and practices followed with respect to the handling of mail are, with minor exceptions, applicable throughout the A.C.I., to mail of convicted prisoners as well as to mail of those awaiting trial.

2) *Censorship Authorization.* When a prisoner enters the A.C.I., if he desires mail privileges he is required to sign an "Authorization for Disposition of Mail," authorizing the warden or his representative to "open and examine all mail matter and express or other packages which may be directed to [the inmate]." The officer before whom the authorization is given is required to countersign, certifying that the prisoner "signed the same voluntarily" in his presence.[10]

3) *The Approved Correspondence List.* At approximately the same time, the prisoner completes a requested "Correspondence and Visit List," [11] listing the persons with whom he wishes to visit and correspond. This list is normally confined to relatives and friends.[12] The inmate is entitled to have as many as seven correspondents, although additional persons may be added to the list through special approval of institutional officials. Attorneys are not ordinarily included on these lists.[13] Inmates may correspond with certain persons in addition to those on the correspondence list through the use of "special purpose" letters. These include letters to courts and to attorneys of record.[14] The correspondence list is subject to the approval of the Classification Department.[15] To assist classification officials in deciding whether to approve the request list, the inmate is asked to give certain information concerning each person listed, including name, relationship to inmate, address, age, occupation, and arrest record.[16] The officials may conduct investigations of proposed correspondents before giving approval. Ordinarily, married inmates are not permitted to correspond with women other than their wives, mothers and sisters.[17] And, although unmarried inmates can corre-

---

10. A sample copy of the authorization is set forth in plaintiffs' exhibit no. 3, as follows:

ADULT CORRECTIONAL INSTITUTIONS
STATE OF RHODE ISLAND
AUTHORIZATION FOR DISPOSITION OF MAIL

I hereby authorize the Warden or his authorized representative, to open and examine all mail matter and express or other packages which may be directed to me at my present address.

Dated this _____ day of _____ 19___.

_____
Inmate's Signature

I hereby certify that the above was read and fully explained by me, and that he/she signed the same voluntarily in my presence, this _____ day of _____ 19___.

_____
Identification Officer

———◆———

11. Inmate Guide, Adult Correctional Institutions, Howard, R.I., at 10 (1967). This book of institutional rules and procedures was admitted in evidence as plaintiffs' exhibit no. 1. The form used by the inmate in preparing his request list was introduced as plaintiffs' exhibit no. 4.

12. Inmate Guide, *supra* note 11, at 10.

13. Plaintiffs' exhibit no. 4.

14. *Id.*; Inmate Guide, *supra* note 11, at 10 (1967).

15. Inmate Guide, *supra* note 11, at 10 (1967).

16. Plaintiffs' exhibit no. 4.

17. *Id.*

spond with approved unmarried women, they ordinarily are not permitted to correspond with married women other than their mothers and sisters.[18] Special permission must be obtained from the warden before an inmate may correspond with an ex-inmate, a person with a criminal record, or an inmate of another institution.[19] Permission must also be obtained from probation or parole authorities before correspondence will be allowed between an inmate and a person on probation or parole.[20] The approved correspondence list may be modified from time to time. Changes are processed through the Classification Department.[21]

4) *Limitations on the Number of Incoming and Outgoing Letters*. Written regulations limit the number of incoming letters from approved correspondents which an inmate may receive to seven per week, not including letters received from special purpose correspondents, such as attorneys of record or courts.[22] The testimony adduced at the hearing, however, indicated that, in practice, defendants have not restricted the number of incoming letters in any way. Awaiting trial inmates may write and send one letter per day to persons on their authorized correspondence list, while post-conviction inmates may send out two letters per week for which the state will pay postage, and a reasonable amount of additional mail for which the inmate himself must pay.[23]

5) *Incoming Mail: Special Requirements*. Incoming mail must not exceed two sheets and cannot be larger than 8½" by 11" in size. The complete name and address of the sender must be on the upper left hand corner of the envelope and at the end of the letter. Letters from persons other than the sender should not be enclosed. Stamps should not be sent in a letter to an inmate, although money, preferably in the form of money orders, may be included. A letter in a language other than English must be translated before it will be given to the inmate. No package may be sent to any person at the A.C.I., without prior permission. Books, magazines, and newspapers coming by mail will not be delivered to an inmate unless they are approved by the Education Department, and are mailed directly from the publisher or book store.[24]

6) *Outgoing Mail: Special Requirements*. Outgoing correspondence must be written on authorized stationery.[25] Letters are restricted to a single sheet of this stationery, although both sides may be used. Legal documents are exempt from this restriction on length. Letters written in any language other than English must be translated before leaving the institution.[26] The book of regulations for A.C.I. inmates contains the following requirements concerning the content of outgoing correspondence:

Correspondence must contain information of a personal nature to you and your correspondent only. It must not contain information about or from other inmates, discussion of institutional problems or policies or reference to institutional personnel. If slanderous, obscene or vulgar language is used, it may be a matter for possible disciplinary action.[27]

7) *The Censoring Officer*. The censorship of mail is conducted by the "censoring officer." At present the censor-

18. *Id.*

19. Inmate Guide, *supra* note 11, at 10, 11 (1967).

20. *Id.*

21. Plaintiffs' exhibit no. 4.

22. *Id.*; Inmate Guide, *supra* note 11, at 11 (1967).

23. Inmate Guide, *supra* note 11, at 11 (1967).

24. *See Id.* at 12 for a list of the restrictions on incoming mail.

25. A.C.I., Post Orders for Post #4, Mail Censor, at 5. This document was introduced in evidence as plaintiffs' exhibit no. 2.

26. *See* Inmate Guide, *supra* note 11, at 11, for a list of restrictions on outgoing mail.

27. *Id.*

ing officer is a custodial or security officer who is also in charge of the inmate records office of the A.C.I., but other security officers are eligible to perform this duty and do so on occasion. In the "post orders" explaining the duties and responsibilities of the censoring officer, we find the following directions concerning the handling of mail:

It shall be your responsibility to examine all correspondence both incoming and outgoing to and from inmates. You shall be alert to detect attempts being made to slander this institution, its officials, or other officials working for the State of Rhode Island. You shall be constantly alert to detect and intercept correspondence containing codes regardless of whether or not the correspondence is incoming or outgoing. You are to be alert to detect correspondence concerning domestic problems, deaths, divorces, etc. You are to refer such letters to the Classification Dept. All incoming or outgoing correspondence to or from judges, parole board, police officials, attorneys, chaplains, etc. shall be referred to the Classification Dept. A member of this department shall authorize mailing out such a letter by initialling same. You shall record the letter and the classification officer's name on the inmate's official correspondence form.

Testimony at the hearing showed that the censoring officer or his substitute open, inspect and read all mail, incoming and outgoing, from whatever source and to whatever destination. This fact is known by the inmates of the A.C.I.

8) *Purposes of Censorship in General.* One of the general purposes for opening, inspecting and reading mail is to insure that the rules and restrictions pertaining to correspondence, as described above, are complied with.[28] More basic, however, is the purpose of maintaining security. For instance, letters are read for possible disclosure of escape plans.

9) *Reasons for Censoring Incoming Mail.* The prison officials testified that incoming and outgoing mail are censored for different reasons. Incoming mail is generally examined to detect instruments of escape and other similar contraband, to screen out pornographic material, and to exclude narcotics or drugs. If contraband is found, it is confiscated by the censoring officer and, in serious cases, turned over to prosecuting authorities for possible institution of criminal charges.

A.C.I. officials testified that, in their opinion, it is necessary to screen out pornographic material because it arouses, stimulates and leads to an increase in the amount of perverse sexual conduct which takes place within the prison. This is, however, a matter of conjecture and opinion on the part of prison officials. Furthermore, the censoring officer is provided no guidelines or standards for determining what constitutes pornography. Any incoming material which, in his opinion, constitutes pornography, is confiscated by him. If he feels unable to make a final determination of whether a particular item falls within the category of pornography or not, he may go to a superior officer for instructions.

10) *Narcotics and Drugs.* At the request of this court, Mr. Ed W. Cass, Deputy Regional Director of the Federal Bureau of Narcotics and Dangerous Drugs, gave testimony concerning the methods by which drugs can be smuggled into a penal institution through correspondence. He stated that one drop of a solution containing L.S.D., when placed on a piece of paper, can give a person who later ingests the paper containing that evaporated drop a "trip" lasting up to sixteen hours. And, the more absorbant the paper is, the greater is the quantity of L.S.D. which can be infused into the paper. He added that the drug can be detected in some instances through visual inspection of the paper because it sometimes leaves a stain. However, this drug would escape detection even upon close visual inspec-

28. *See* notes 17 through 27, *supra*, and accompanying text.

tion in many instances because it often leaves no telltale stain. There are chemical tests which could be employed to detect the drug in paper, but at the present time these tests would be impractical for use in a prison censorship context.

Plaintiffs' counsel elicited testimony from Mr. Cass to the effect that anyone taking L.S.D. in prison could be detected by observation, seeking to establish that such observation could provide an alternative to detection of drugs through opening and inspection of mail. In rebuttal, counsel for defendants obtained Mr. Cass' testimony to the effect that a person experiencing an L.S.D. "trip" and one suffering from a serious personality disorder could present the same outward appearance to an observer and it would therefore be impossible to detect the drug user merely through his outward conduct.

11) *Purposes in Censoring Outgoing Mail.* The Assistant Director for Correctional Services testified that he feels he has a statutory duty [29] to engage in censorship for the protection of the public. Some inmates would engage in "confidence" schemes, he claimed, in the absence of censorship. As an example of this he cited an instance in which a prisoner had attempted to send letters to parents of men killed in Viet Nam, stating that he had known the son, had taken a picture of him before he was killed, and now needed money in order to develop the picture. He testified that there is a danger that prisoners will enter into criminal conspiracies with persons outside the prison.

He also stated that censorship is necessary to protect the outside community from insulting, obscene or threatening letters. Accordingly, the censoring officer has been given the authority to stop any letter that is insulting, fraudu-

lent, threatening or not in good taste, or any letter that casts the prison in an unfavorable light. Letters to the courts, to public officials and to attorneys are all read and censored for the above reasons. The Assistant Director felt that he had a duty to shield even the courts from this type of letter. In argument, however, counsel for defendants conceded that there is no valid reason for reading and censoring of letters to courts or to public officials. However, he made no such concession with regard to attorney mail. He took the position that some attorneys are unscrupulous and would conspire with client-prisoners for criminal purposes, and that this category of mail should be subject to censorship.

12) *Processing of the Mail.* The censoring officer may make a copy of any paper, incoming or outgoing, which he feels is significant enough to be placed in the inmate's file. Papers thus placed in the inmate's file may be referred to and used in prison classification and disciplinary proceedings and could, conceivably, have some effect on the granting or withholding of parole. The censoring officer may also give papers from the mail or copies thereof to the Attorney General of Rhode Island or to police agencies for possible prosecution.

If only a portion of a letter is objectionable, that portion is not deleted; instead, the censor stops the letter. If the objectionable letter is incoming, it will either be returned to the sender or held and later destroyed. Outgoing mail which fails to meet the censor's standards is usually returned to the inmate who sent it.

All mail is stamped "Censored" before being sent or given to its addressee. Generally, all mail, both incoming and outgoing, is processed within twenty-four hours.

---

29. R.I.Gen.Laws § 13-2-23 (1969 Reenactment). This section provides that the "Assistant director * * * may admit such communications to and from prisoners and their friends * * * and such books and other articles to be given to them, as he may deem expedient, the same being consistent with the safekeeping of the prisoners."

## CONCLUSIONS OF LAW

Our enlightened concern for individual human rights as it has penetrated prison compounds has taken us a long way from the judicial attitudes of the past as illustrated by the following language from Ruffin v. Commonwealth, 62 Va. (21 Gratt.) 790, 796:

"He [the convicted felon] has as a consequence of his crime, not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords to him. He is for the time being the slave of the State."

Today's growing recognition of prisoners' rights perhaps finds its genesis in Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), in which case the court repudiated the idea that prisoner privileges were exceptional by stating, "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law."

Implicit in this retention of rights concept is the need to define them in relation to the restrictions demanded for prison security and orderly administration. Though maintenance of institutional discipline is not the function of the court, it must, nevertheless, interfere by articulating the permissible applicable standards when there has been a deprivation of prisoners' constitutional rights. In this case especially it is most compelling, for the plaintiffs herein are in the awaiting trial section of the Adult Correctional Institution and must be presumed innocent while in such status.

Though the question of censorship of prisoners' mail by prison officials is not a novel issue before the courts, few guiding precedents have been established.[30] Indeed this court would not be candid if it did not recognize that the legal profession and our courts have made shamefully few attempts to codify constitutional rights in a prison context, particularly relating to men awaiting trial. It may be said that no direct authority exists for the broad relief which the plaintiffs seek in the case in chief. But one of the greatest attributes of the law is its flexibility, which allows it to be an instrument for social change and for the declaration and enforcement of the basic rights of all members of our society.

However, before considering (the) four primary factors [probability of irreparable harm, probability of success on the merits, the balancing of interests and preservation of the status quo] deemed paramount in deciding whether to grant a temporary restraining order, it is essential that this court first determine if the relief requested is a permissible quest for the protection of (First and Fourth Amendment) constitutional rights.

In spite of the pronouncements in the cases cited supra [31] that prison officials have broad powers of censorship, I find justification only for fewer restrictions because total censorship serves no rational deterrent, rehabilitative or prison security purposes.[32] The record before this court, though pregnant with utterances of fear in the testimony of the prison officials, offers nothing in this regard by way of creditable evidence—excepting the testimony of Mr. Cass which I found most compelling. Legal

---

30. Officials censoring incoming and outgoing mail: Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965); Adams v. Ellis, 197 F.2d 483 (5th Cir. 1952); Ortega v. Ragen, 216 F.2d 561 (7th Cir. 1954) cert. denied, 349 U.S. 940, 75 S.Ct. 786. 99 L.Ed. 1268 (1955); Fulwood v. Clemmer, 206 F. Supp. 370 (DDC 1962); Dayton v. Hunter, 176 F.2d 108 (10th Cir.) cert. denied, 338 U.S. 888, 70 S.Ct. 184, 94

L.Ed. 545 (1949); Numer v. Miller, 165 F.2d 986 (9th Cir. 1948); Fussa v. Taylor, 168 F.Supp. 302 (MD Pa.1958).

31. *Id.*

32. *See, e. g.*, The Right of Expression in Prison, 40 So.Calif.L.Rev. (1967); The Problems of Modern Penology: Prison Life and Prisoners' Rights, 53 Iowa L. Rev. 671 (1967).

scholars advocate the dilution of the absolutism the authorities seek so zealously to preserve and perpetuate.

"We argue for fewer restrictions on letter writing. Letter writing keeps the inmate in contact with the outside world, helps to hold in check some of the morbidity and hopelessness produced by prison life and isolation, stimulates his more natural and human impulses, and otherwise may make contributions to better mental attitudes and reformation." [33]

## INFRINGEMENT OF THE FIRST AMENDMENT

■ Both oral and written communications are included within the First Amendment guarantee of freedom of speech. The free speech clause of the First Amendment is broad enough to comprehend the right to correspond with others. In addition, correspondence sent to public officials to protest injustices or seek to redress alleged grievances is protected under the clause of the First Amendment which guarantees the right to petition for redress of grievances.

It should also be kept in mind that we are here concerned not only with the First Amendment rights of plaintiffs but also with the rights of all persons or institutions outside the prison who wish to correspond with the plaintiffs.

■ Included in this group are publishers and newspaper reporters. Freedom of the press is, therefore, an important element in this case since freedom to circulate printed material is as essential to freedom of the press as is freedom to publish,[34] and the burden is on the prison authorities to show a compelling justification for interfering with the free exercise of those freedoms.

In the area of the First Amendment, the United States Supreme Court has given us two applicable tests, namely the

"clear and present danger" test as originally advocated by Justices Holmes and Brandeis in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919), and the modification of this test as enunciated in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137 (1951), analyzing the need for restrictions on freedoms in terms of the consequences which would result if no restrictions existed—the employment of less burdensome alternatives to accomplish the desired result should be considered.

In a recent case involving the application of the *Dennis* version of the clear and present danger test in a prison context, Judge Tuttle said:

"(In the area of First Amendment freedoms) we have pointed out that stringent standards are to be applied to governmental restrictions * * * and rigid scrutiny must be brought to bear on the justifications for encroachments on such rights. The State must show some substantial and controlling interest which requires the subordination or limitation of these important rights, and which justifies their infringement * * *; and in the absence of such compelling justification the State restrictions are impermissible infringements of these fundamental and preferred rights.

Moreover, in examining the justification for state infringement (in the area of First Amendment freedoms) the Supreme Court has recognized and declared the principle that the means used by the State, as well as the ends, must be legitimate. Even the most legitimate of legislative ends cannot justify the infringement of fundamental rights of individual citizens if these ends may be accomplished by the use of less restrictive alternative means which result in less invasion of these fundamental rights." [35]

33. The Right of Expression in Prison, *supra*, at page 418.

34. Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877.

35. Jackson v. Godwin, 5 Cir., 400 F.2d 529, n. 45 at 533, 541. See also Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). "Even though the governmental purpose be legitimate

In the application of these principles, this court must now determine whether the ends or purposes of censorship as practiced at the Adult Correctional Institution are legitimate. This I determine as a single judge fully realizing that my role on this motion is a narrowly defined one because the resolution of the principal issues in this case must be left to the entire court of three judges.

I will now consider this issue in relation to the four primary factors hereinbefore referred to.

1) 28 U.S.C. § 2284(3) specifically directs inquiry into the probability of irreparable harm if such an order is not granted. On this point, plaintiffs have argued that defendants' action impedes the right to meaningful assistance of counsel, violates the constitutional protections against unreasonable searches and seizures, violates plaintiffs' privilege against self-incrimination, makes a shambles of the attorney-client privilege between plaintiffs and their respective counsel, effectively denies the right of free and confidential access to the courts, and destroys the right of marital privacy. This alone is an impressive array of substantial contentions, some of which have recently been the basis for relief in Sostre v. Rockefeller, 312 F. Supp. 863 (S.D.N.Y.1970). However, this action today rests entirely on my belief that plaintiffs' fundamental right of free speech suffers under defendants' restrictions—so in compliance with 28 U.S.C. § 2284(3), I find irreparable damage to exist under present prison conditions.

2) Though it is not apparent from the face of 28 U.S.C. § 2284(3), some courts have emphasized that a temporary restraining order will issue only when the party seeking it is likely to succeed on the merits. See, e. g., Greyhound Lines, Inc. v. United States, 301 F.Supp. 356 (N.D.Ill.1969). This court thinks

that the better-reasoned view, however, is that the likelihood of success on the merits should be a minor factor, especially where the potential injury is great. As the court held in G. B. C., Inc. v. United States, 302 F.Supp. 1283 at 1284 (E. D.Tenn.1969):

> " * * * if the balance of hardships tips decidedly toward the plaintiff, it is ordinarily sufficient that the plaintiff has raised questions going to the merits which are so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus, for more deliberate investigation."

Clearly plaintiffs' contentions regarding censorship are not frivolous and will demand deliberate investigation, and their likelihood of success appears probable upon the present state of the record.

3) A balancing test, based upon the potential injuries to each party from the granting or denial of a temporary restraining order, has also been judicially engrafted onto the statute in question here. Plaintiffs' probable injury from denial of the order has already been set forth. Defendants' alleged injury from the entry of an order is also substantial, insofar as it relates to the safety and security of the prison. The safety of the general public is also a factor which this court has taken into consideration.

4) This court is also aware of the maxim that a temporary restraining order will issue only to preserve the status quo, see *Greyhound Lines, supra.* Yet that principle, too, has been assailed as follows:

> The concept *status quo* lacks sufficient stability to provide a satisfactory foundation for judicial reasoning. The better course is to consider directly how best to preserve or create a state of affairs in which effec-

and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The

breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose."

tive relief can be awarded to either party at the conclusion of the trial. Note, Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1058 (1965).

■ A determination of how best to create a state of affairs conducive to effective relief may seem to rest, however imperceptibly, upon a prediction of the ultimate decision on the merits. This court decides, without pre-judging the merits, however, that it must restrain certain continuous and repeated denials of plaintiffs' fundamental right of free speech even if it upsets the status quo.

■ In evaluating the restrictions upon the plaintiffs' mail, I fully recognize that maintaining security at the Adult Correctional Institution is so obvious and fundamental a legitimate objective as to obviate the need for any further comment. The prevention of escapes, riots and assaults by inmates are legitimate goals of prison authorities. They must be allowed to take all necessary steps to prevent the introduction of objects into the prison such as weapons and hacksaw blades; highly inflammatory writings advocating the violent overthrow of governing authorities can legitimately be screened out; and the mails should not be used to convey illegal materials into the prison such as narcotics and drugs or hard core pornography. The introduction of most, if not all, of such objects or materials into a prison would constitute criminal conduct.[36] However, in taking steps to prevent the introduction of such items into the prison, even though the purpose or end in view is legitimate, prison officials must use means which are legitimate and which provide the least restrictive of the alternative methods of accomplishing the desired end.

■ The current practices of correspondence control at the Adult Correctional Institution are either highly questionable or beyond the legitimate role of prison authorities. For example, officials at the Adult Correctional Institu-

tion have used such controls to suppress any criticism of the institution or institutional officials. I fail to appreciate such an attitude which smothers information to the public about prisoners and prison life—it serves no rational social purpose supportive of prison objectives. It merely serves to destroy one of the few vehicles prisoners have of informing the public about their existence—a public which should know so that it can exercise its responsibility in a meaningful way. Furthermore, it is my view that censorship for such reason is an unconstitutional infringement of the First Amendment rights of the plaintiffs, including the right to petition for redress of grievances.

■ Officials of the Adult Correctional Institution have also taken it upon themselves to read and screen outgoing mail to protect the public, including the courts, from insulting, vulgar letters. This is not their function—they are not the protectors of the sensibilities of the public which can protect itself.

There are many alternative methods of handling prisoners' mail between the extremes of no censorship in any form and the practice of not recognizing any rights at all of prisoners to receive or send mail. I find a workable point of accommodation to be that set forth in my ruling, infra, which in my opinion fully satisfies the requirements of the First Amendment in a prison context.

■ I hereby rule as follows, effective forthwith:

## A) PUBLIC OFFICIALS AND ATTORNEYS

1) The defendants, their employees and agents shall not open or otherwise inspect the contents of any incoming or outgoing letters between inmates and the following persons:

a) The President of the United States; any United States Senator or Congressman; Judges of any of the Federal Courts of the United States; in-

---

36. *See, e. g.,* R.I. General Laws, Sec. 11–25–8 (1969 Reenactment).

cluding the clerks of said courts, the Attorney General of the United States and Director of the Federal Bureau of Prisons.

b) The Governor of the State of Rhode Island, Supreme, Superior and District Court Judges of Rhode Island; Lt. Governor, Attorney General, Secretary of State, General Treasurer, and any member of the Rhode Island State Legislature or any state prison official or member of the Parole Board.

c) The inmates' attorney(s); and any other attorney duly licensed to practice law in Rhode Island.

I cannot accept the rationale of the various court decisions such as United States ex rel. Vraniak v. Randolph, 161 F.Supp. 553 (E.D.Ill.) and Green v. Maine, 113 F.Supp. 253 (D.Me.1953) upholding the censoring of mail between prisoners and attorneys. Brabson v. Wilkins, 45 Misc.2d 286, 256 N.Y.S. 2d 693, mod. 25 A.D.2d 610, 267 N.Y.S. 2d 580, though striking down the conduct of a warden in intercepting a prisoner's letter to his court-appointed attorney nevertheless permitted it to be read, censored and in addition granted authority to strike material not relating to the legality of the inmate's detention or treatment.

█ I find that contact with an attorney, and the right to consult privately, is vital to an inmate's access to the courts.[37] In this case the plaintiffs and their trial attorneys are in the process of preparing for their criminal trials and to permit censorship by ACI officials of mail between the inmate and his counsel is to render ineffective the guarantee of the Sixth Amendment. Acknowledging it is true that a lawyer and his prisoner client can by-pass the censoring

process if the lawyer visits the inmate in person, the fact remains such restraint is not warranted—its inhibiting effect upon the exchange of ideas dilutes the effective assistance of counsel—it prevents the full effectuation of the Sixth Amendment.

I agree fully with Judge Keating in his dissent in Brabson v. Wilkins, *supra*:

"The Attorney General alleges that 'prisoners would be able to carry on unauthorized activities through communications from prisoners to their attorneys and thence to third parties.' Uncensored communications, however, presently occur on personal visits to the prison by the prisoner's attorney and members of his family, without any apparent undermining of prison discipline. In any event, the right of a prisoner to unexpurgated communications with his attorney is so significant that it outweighs the danger of frustration of prison rules regarding outside activities in the rare case where an attorney—an officer of the court—would assist a prisoner in avoiding legitimate prison regulations."

There is no logical nexus between censorship of attorney-inmate mail and penal administration. It is just another veil which can help hide an administration which perhaps should be a prime subject for judicial review.

d) The defendants, their employees and agents may take time not to exceed forty-eight hours to verify the name, address and official position of the addressee in the case of outgoing mail and that the alleged addressor in the case of incoming mail is the sender of the particular letter.[38]

37. In re Rider, 50 Cal.App. 797, 195 P. 965; Burns v. Swenson, 300 F.Supp. 759 (W.D.Mo.1969).

38. See Lowe v. Hiatt, 77 F.Supp. 303, 305 (MD Pa. 1948) Jacob, Prison Discipline and Inmate Rights, 5 Harv.Civ.Rights—Civ.Lib.L.Rev. 227, 238; Lee v. Tahash, 352 F.2d 970; Problems of Modern Penology: Prison Life and Prisoners' Rights, 53 Iowa L.Rev. 671, 677;
"I believe that these limitations as well as the authority given the Warden unnecessarily interfere with and endanger this prisoner's right to communicate with his attorney and governmental officials having either jurisdiction over the penal system or the power and

It may be argued that closely related to the right to freely communicate with the courts is the right to have access to the materials needed to make this communication effective. The resolution of this question I leave for the full court and invite counsel to brief and argue whether or not prisoners should have reasonable access to law books and legal materials.[39]

## B) LETTERS GENERALLY INCOMING

■ 1.) All *incoming* letters, excepting those discussed under "Public Officials and Attorneys," supra, may be opened and inspected for L.S.D. stains and the like, drugs, weapons, escape instruments and similar items which threaten the safety and/or security of the prison.

2.) Since highly inflammatory writings and hard core pornography as hereinbefore mentioned can only be detected and screened through a reading of the same—all incoming letters and the contents thereof may be read and inspected for said purposes. However, excepted from this control are all letters addressed to an inmate from his approved addressee list (see infra this text) which I

rule may be inspected as recited in 1 above but may not be read.

■ a) In taking steps to prevent the introduction of such items into the prison, even though the purpose or end in view is legitimate, prison officials must use means which are legitimate and which provide the least restrictive of the available alternative methods of accomplishing the desired end.

■ In screening out pornographic materials, prison officials must strictly abide by the guidelines set forth by the Sureme Court in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. Defendant officials have given an untrained custodial officer unbridled discretion to screen out any material which in his subjective opinion he believes to be pornographic. This, of course, is not a legitimate method of preventing hard core pornography from entering the ACI.

Here the Court is mindful of post-*Roth* decisions in the area of obscenity but has chosen to confine the censorship guidelines of this case as stated therein. Whether there should be any bans at all on pornography will best be determined after a full hearing on the merits before the full court. Counsel are invited to

authority to correct conditions existing therein. * * *

* * * * *

* * * Judges and courts are not the only persons or agencies capable of granting relief to prisoners complaining about the illegality of their treatment or detention. For this reason, I see no basis for distinguishing between letters to courts, to the prisoner's attorney or to government officials. In all of these cases only the recipients of the letters should be permitted to determine whether the contents warrant their intervention and not the very person whose jurisdiction and conduct are being questioned.

* * * * *

Among the rights of which he may not be deprived is the right to communicate, without interference, with officers of the court and governmental officials; with those persons capable of responding to calls for assistance. No valid

reason, other than the shibboleth of prison discipline, has been advanced for the denial of this right in the case before us. I believe that courts should look behind inappropriate slogans so often offered up as excuses for ignoring or abridging the constitutional rights of our citizens." Brabson v. Wilkins, 19 N.Y.2d 433, 438, 440, 280 N.Y.S.2d 561, 564.

39. See in this connection Johnson v. Avery, *supra* n. 84; Jacob v. Sharma, *supra* n. 92 at 589 and n. 92 at 518–520, 590; Constitutional Rights of Prisoners; The Developing Law, 110 U.Pa.L.Rev. 985, 992–94 (1962) ; People v. Superior Court, 273 P.2d 936 (Cal.Dist.Ct.App.1954) ; In re Chessman, 44 Cal.2d 1, 279 P.2d 24; Bailleaux v. Holmes, 177 F.Supp. 361 (D.Ore.1959), rev'd sub nom. Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir. 1961) ; American Correctional Assn. Manual of Correctional Standards (3rd ed. 1966).

brief and argue this point.[40] I am also aware that present ACI officials may understandably lack expertise in the *Roth* area of obscenity.

However, competent, legally-trained personnel is available to assist the defendants in this regard.

b) All letters found objectionable as falling within the classification of 2 *supra* may be confiscated—whereupon the prisoner will be so notified in writing setting forth the name and address of the sender, date of the correspondence and the reason for said confiscation.

### C) LETTERS GENERALLY OUTGOING

■ Although defendant prison officials in this case claim that they need to read all mail,[41] incoming and outgoing, they do not attempt to listen to or censor in any way conversation between inmates and their visitors. In fact the general practice in prisons throughout the United States is to allow free conversation between prisoners and their visitors. The fact that officials have not found it necessary to listen to such conversations in order to thwart escapes and otherwise maintain security raises serious questions concerning their alleged need to read prison correspondence. Therefore this Court rules that

1) the reading of any outgoing mail from the inmates is unnecesary and in violation of the First Amendment rights of the parties involved unless pursuant to a duly obtained search warrant, and in the absence of the same no outgoing prisoner mail may be opened, read or inspected.

### APPROVED ADDRESSEE LIST

■ The Court will conclude for the purposes of this motion that an approved addressee list of seven persons to whom an inmate may write is a reasonable method of maintaining prison security without undue restriction on the First Amendment rights of prisoners and such correspondents, so long as the criteria used in the preparation of such lists are rationally related to the purposes of confinement and the security of the institution. The Court invites counsel to further argue and brief this point for the hearing on the merits. Of course, all correspondence in category A—"Public Officials and Attorneys" is in no way affected or limited by such approved list. In this argument the Court specifically asks—Why should there be any limitation on the number of correspondents except as it may be based on the amount of time available to the inmate for writing letters and the amount of physical space and facilities available?

### APPLICABILITY OF THE FOURTH AMENDMENT

■ Though this Court has focused mainly on the issue before it as it relates to the First Amendment, it is of the opinion that the conduct of the ACI officials of indiscriminately opening and reading all prisoner mail including that of unconvicted awaiting trial inmates, whether the same be from the inmates or members of the free society, is a violation of the Fourth Amendment. This cannot be condoned nor allowed to continue, though by necessity the full sweep of the Fourth Amendment obviously cannot apply in a prison or jail context. It is this Court's opinion that the right to be free from unreasonable searches and seizures is one of the rights retained by prisoners subject, of course, to such curtailment as may be made necessary by the purposes of confinement and the requirements of security. Like

40. For the same reason, this court has not evaluated each prison censorship regulation individually, but has left that task to the full court. However, the order based upon this opinion shall have the effect of enjoining the enforcement of those regulations which are inconsistent with this opinion, until such time as the entire court has rendered its decision on the merits.

41. This opinion relates only to letters and has no effect upon existing practices relating to other bulk mail.

all things there must be a point of beginning and in this area of evolving law, where its expansion must be tailored to the peculiarities of the prison environment, this case offers as such a point these guidelines for the censorship of mail, which in my opinion, satisfy the mandate of the Fourth Amendment as it may apply to a penal institution and are applicable for the purposes of this motion.[42] I feel compelled to comment on the Fourth Amendment waiver signed by prisoners at the time of commitment. In exchange for mail "privileges" ACI officials require from each inmate his signature to a written statement authorizing them to censor his mail. It is this Court's view that such "authorization" under the inherently coercive circumstances under which it is given is without effect and cannot operate as a waiver or consent under the Fourth Amendment to the opening and reading of all of his mail.

This opinion relates only to letters. It has no effect upon existing practices relating to other bulk mail—including books, magazines and newspapers nor have I attempted to evaluate each prison censorship regulation individually. This task is left to the full court. Therefore, the following order is hereby entered—

### ORDER

Only four of the defendants, defendants Travisono, Sharkey, Howard and Black have direct control over the mails and mail censorship at the ACI, and for that reason relief need only be granted in this case against these four individuals. They are hereby enjoined from following any rules, regulations or practices which are inconsistent with the guidelines set forth in this opinion.

---

42. Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919) held that letters written by an inmate may be interrupted without a warrant, transmitted to the prosecutor and later used against the inmate in a criminal trial without violating the Fourth Amendment. See Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962) where it is indicated in the majority opinion that the visitors' room in a jail is not a constitutionally protected area of privacy. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)—points out that the Fourth Amendment protects people not places and held that the government's activities in electronically listening to and recording petitioner's words while using a telephone booth violated the privacy upon which he justifiably relied and thus constituted a "search and seizure" within the Fourth Amendment.