Guadalupe GUAJARDO, Jr.

v.

Warden McADAMS, Wynne Unit, and Assistant Warden Shannon, Wynne Unit, Texas Department of Corrections.

Guadalupe GUAJARDO, and others similarly situated

v.

Dr. George J. BETO, Director, W. D. Kutach, Asst. Director, D. J. McKackle, Director Classifications.

Civ. A. Nos. 71-H-570, 72-H-64.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 25, 1972.

Richard Trabulsi, Jr., Houston, Tex., for petitioner.

Gilbert J. Pena, Asst. Atty. Gen., Austin, Tex., for respondents.

SINGLETON, District Judge.

*Memorandum and Order:*

Guadalupe Guajardo, Jr., the named petitioner herein, has filed three suits which in the interest of justice have been consolidated and an evidentiary hearing lasting several days was held. In one action (C.A. 72–H–64), petitioner sued in a 42 U.S.C. § 1983 class action on behalf of all Texas Department of Corrections (hereinafter TDC) inmates, alleging that defendants have arbitrarily and without due process denied under color of state law the class the right to receive and read books, magazines, newspapers, instructional material, public documents [e. g. Papel Chicano La Verbal (a Spanish language paper directed towards the Mexican-American community) and other Chicano papers, the La Salle and Blackstone Law Course, The Fortune Society Newsletter, Ten Bow, Playboy, Evergreen, The Democrat, the United States Constitution annotated, the U. S. Reports, Federal Reporter, Federal Supplement, and Space City (a local newspaper)]. The class also alleges that the defendants have abridged their freedom of speech, press, expression, religion, and access to the courts inconsistent with due process of law by denying them the right of correspondence with anyone not "approved" by the defendants [e. g., friends, newspapers, persons assisting them in the prosecution of appeals and collateral matters, public figures, and religious leaders]. Petitioners also complain that by censoring all incoming and outgoing mail, and on occasions making copies thereof, is inconsistent with their First Amendment rights.

Petitioner Guajardo filed a 42 U.S.C. § 1983 suit (C.A. 71–H–570) against Warden McAdams of the Texas Department of Corrections, alleging that he was not allowed access to legal materials as other inmates were and, therefore, was denied his constitutional right to redress of his grievances. Petitioner has also put into issue the administrative process whereby he was put in a form of segregation (i. e., administrative segregation) from the remaining prison population.

The third suit (C.A. 72–H–9) is also a cause filed under 42 U.S.C. § 1983. There, petitioner Guajardo individually alleged that W. Dee Kutach, Assistant Director for treatment of inmates at the TDC denied him the privilege of taking a law correspondence

course because he could not pay for the course in full before enrolling therein. Because the financial responsibilities for the expense of such a course should reasonably fall on the inmate and because the administrative burden of handling suits and letters for nonpayment from schools falls on the prison, the prison rule requiring payment in full is reasonable and does not deny petitioner any constitutional right. This cause in the consolidated cases was therefore dismissed on February 25, 1972.

The evidence given at trial did show that the above-mentioned magazines and newspapers were excluded from the prisoners' reading material whether privately paid for or not. Testimony also established that Spanish language publications were not on the whole allowed into any of the prisoners' reading materials. [Spanish speaking inmates form a sizable minority in the Texas Department of Corrections. This court made the finding at trial that both incoming and outgoing mail regardless of sender or addressee was read and censored. If censored or rejected by a mail-room clerk there was no established written procedure whereby a prisoner could appeal such censorship. Dr. Beto, Director of the Texas Department of Corrections, testified that all prisoners know they can write him a letter complaining of any action or treatment in any unit of the system, but the formal redress of prison grievances evidently stopped there. This court further finds that prisoners were not allowed to keep any of their own law books in their cell even though they were allowed to keep their private books of similar size and shape on other subjects in their cells. The prisoners were allowed to use legal materials in a writ room three times a week two hours each session. [In petitioner Guajardo's case, the writ room also had a television playing at this time.]

The evidence established that the procedure whereby a prisoner was placed in administrative segregation was extremely indefinite or totally undefined; sometimes a warden would have a prisoner separated from the prison population at his own discretion, sometimes a subordinate would use his own discretion. But most important is the fact that no Texas Department of Corrections official who testified was precisely sure how a prisoner could get out of administrative segregation once put there. There was no procedure whereby a prisoner could determine or discover why he had been segregated or any administrative procedure providing a means whereby a prisoner could change his segregation status. This is of very vital concern to inmates; for while in segregation they can rarely accumulate "points" which is the merit system in the Texas Department of Corrections whereby prisoners are given certain privileges such as permission to take correspondence courses. Apparently, a prisoner could stay in the limbo of administrative segregation for an undefined period of time (which the Texas Department of Corrections says is not a punitive status) with no procedural safeguards.

■ After the first few days of the hearing, the court recessed in order that the Texas Department of Corrections could review its rules and regulations. At the second hearing, Dr. Beto testified that the Texas Department of Corrections had abolished its approved reading materials list. The materials in question here had not been on the list. Whether this action does in fact resolve the issue of limiting or censoring the reading materials of prisoners is questionable. Under the new Rules and Regulations 60.88 of the Texas Department of Corrections (July 10, 1972) when any publication is rejected by the Texas Department of Corrections, the inmate who was the intended receiver is to be promptly notified that the reason for its rejection is that the material is believed to pose a clear and present danger to the security of the facility (this can be the only reason for rejection under the Texas Department of Corrections' new rule). The rule commendably requires that after notification of rejection the prisoner may argue to a Review Committee for

acceptance of such material. Unfortunately, Rule 60.88 contains no provision whereby a prisoner may view the rejected publication. The Texas Department of Corrections is the only party to the Committee hearing that has full knowledge of the "charges" against the prisoner and the publication he seeks to receive. This falls short of traditional due process requirements in the Fourteenth Amendment and even short of the requirements of due process for persons in prison custody recently enumerated by the Supreme Court in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). See also Urbano v. McCorkle, 334 F.Supp. 161 (1971). A prisoner should be allowed to view the material at least once before having to "defend" its exclusion. The new Rules allow for a prisoner to review certain withheld mail in front of a prison officer. It appears that the burden of letting the prisoner view the rejected material in front of an officer before the hearing would not be an insurmountable burden. This viewing is necessary in order to bring Rule 60.88 into line with constitutional criteria.

New Rule 60.85 allows inmates to have publications in languages other than English and, obviously, therefore, publications that are directed towards the Chicano community. Accordingly, any of petitioner's complaints in that regard are moot.

■ ■ New Rule 60.87 allows an inmate to have a maximum of four (4) personal law books in his cell during any one period. All other personal law books are kept in the prison writ room and may be taken out or exchanged at writ room hours to constitute the four law books allowed in the cell. This rule represents a reasonable balancing of the physical requirements at the prison and the rights of inmates to prepare legal documents for the redress of grievances. Konigsberg v. Ciccone, 285 F.Supp. 585 (W.D.Mo.1968), aff'd 417 F.2d 161 (8th Cir. 1968), cert. denied, 397 U.S. 963, 90 S.Ct. 996, 25 L.Ed.2d 255 (1970). See the related case In re Harrell, 2 Cal.

3d 675, 87 Cal.Rptr. 504, 470 P.2d 640, cert. denied Harrell v. California, 401 U.S. 914, 91 S.Ct. 890, 27 L.Ed.2d 814 (1970). See also McKinney v. DeBord, 324 F.Supp. 928 (D.Cal.1970) (no more than 16 hardback volumes in cell held to be reasonable rule). The Texas four book limit relates only to personal law books. The rules are silent as to the use of four law books in an inmate's cell if he is in a segregated status (as distinguished from a punitive status). This court cannot accept the Texas Department of Corrections' argument that somehow a convicted prisoner's constitutional rights of judicial appeal are "diminished" and that accordingly they do not need the use of legal materials or law books while in a so-called nonpunitive status of administrative segregation. Being unable to accept this line of reasoning, this court finds that it would be a denial of the equal protection clause of the Fourteenth Amendment to allow prisoners in the general population the use of law books in their cells and not to allow those in administrative segregation such usage in their cells. See generally Urbano v. McCorkle, supra. In the case of Hatfield v. Bailleaux, 9 Cir., 290 F.2d 632, cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961), prisoners in the "segregation wards" were allowed up to forty-nine (49) hours per week or 3600 hours a year in which to "study law and prepare legal documents in their cells." Hatfield v. Bailleaux, supra, 290 F.2d at 640.

The use of law books as provided by the Texas Department of Corrections in its writ rooms was thoroughly litigated in Novak v. Beto, 453 F.2d 661 (5th Cir. 1971) and will not be reviewed here. The time allowed for legal research in the Texas Department of Corrections prison libraries has been held adequate. Cruz v. Beto, 329 F.Supp. 443 (S.D. Tex.), aff'd 445 F.2d 801 (5th Cir. 1971).

■ The prisoners' complaints relating to the mails can be divided into two general categories: (1) special mailings and (2) general mailings. Each of these categories can be subdivided into two

headings: (a) incoming mail and (b) outgoing mail. Special mailings would include, among others, mail to courts and counsel. General mailings would include, among others, personal mail to persons on the approved mailing list. Respondent's counsel and previous cases have both argued that a federal district court should not interfere with the mail regulations of the state prison system. However, since Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) and Andrade v. Hauck, 452 F.2d 1071 (5th Cir. 1971), it would appear beyond question that the first category of special material mailings deal with the constitutionally protected area of access to the courts and any regulations in connection therewith may be reviewed by the court.

Two cases considered basic to this point are Ex parte Hull, 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), and Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965). In the former the Supreme Court held invalid a state regulation which required that habeas corpus petitions be submitted to prison authorities and approved as properly drawn before being forwarded to the courts. The basis of this decision was that the activity authorized by this regulation, "(A)bridg(ed) or impair(ed) petitioner's right to apply to a federal court for a writ of habeas corpus." 312 U.S. 549, 61 S.Ct. 642. In the Lee case, supra, 352 F.2d at 972 (a civil rights action), appealing to the Ex parte Hall, supra, as its basis, it was held that, "(A)ccess to the federal courts for the presentation of alleged legal wrongs . . ." is an "absolute right" that cannot be "denied or infringed upon."

This right of access to the courts has been specifically held to include the right to seek and obtain counsel, Coleman v. Peyton, 362 F.2d 905 (4th Cir.), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966) (a habeas corpus case). The right to seek and obtain counsel must by necessity carry with it the right to use the mail to obtain and communicate with counsel.

Although free access to the courts is a principle originally promulgated with respect to writs of habeas corpus submitted to protest allegedly illegal incarceration, Johnson v. Avery, supra; Ex parte Hull, supra, there is now no question that this principle is also applicable to the use of the Civil Rights Act, 42 U.S.C. § 1983 to remedy denial of rights while incarcerated. Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Morales v. Turman, 326 F.Supp. 677 (E. D.Tex.1971); Andrade v. Hauck, supra.

There is also no question that the instant case fulfills all the qualifications for a 42 U.S.C. § 1983 action, the essential elements being, "(1) that the conduct complained of was by a person acting under color of state statutes or local law, custom or usage, and (2) while so acting, deprived another of rights, privileges or immunities secured by the Constitution and laws of the United States." Palacios v. Foltz, 441 F.2d 1196, 1197 (10th Cir. 1971).

█ Action taken by state officials in the alleged exercise of authority conferred by the state is action under color of a state statute Vernon's Tex.Rev.Civ. Stat.Ann. art. 6166j (1970). Cruz v. Beto, 329 F.Supp. 443 (S.D.Tex.1970), aff'd, 445 F.2d 801 (5th Cir. 1971). The constitutional rights affected are the right to petition for redress of grievances, U.S.Const. amend. I; the right to effective assistance of counsel, U.S.Const. amend. VI; and the due process protection of the prisoner's right to seek access to the courts for consideration of claims concerning the conditions of his imprisonment, U.S.Const. amend. XIV. The statutory rights affected are the right to a writ of habeas corpus, 28 U. S.C. § 2254, and the right to an action under the Civil Rights Act, 42 U.S.C. § 1983.

Although there is general agreement among the courts that prison authorities' regulation and censorship of mail cannot be allowed to deny or impair the prisoner's right of access to the courts, see Andrade v. Hauck, 452 F.2d 1071 (5th Cir. 1971), theer is no uniformi-

ty as to what degree, if any, of regulation and censorship can be allowed without involving denial or obstruction of this access. *See* Censorship of Prisoners' Mail and the Constitution, 56 A.B. A.J. 1051, 1054 n. 25.

■ Clearly intercepting and refusing to mail letters to a state Supreme Court will not be allowed. Jenks v. Henys, 378 F.2d 334 (9th Cir. 1967) (a civil rights action). In Cox v. Crouse, 376 F.2d 824, 826 (10th Cir. 1967), opening letters from the prisoner to his attorney and reading them to the attorney general was found "highly improper" but "allowed by established law" insofar as it did not prevent effective representation nor prejudice the prisoner. In Coleman v. Peyton, 362 F.2d 905 (4th Cir. 1966), a habeas corpus proceeding, mail to the prisoner from the court hearing his complaint and mail from the prisoner to that court could be delayed no longer than necessary for sorting. "Further delay for other purposes, such as censorship, seems both inappropriate and unnecessary." *Coleman, supra* at 907. The court, more specifically, feared undue delay in getting around to censoring such mail. In Tyree v. Fitzpatrick, 445 F.2d 627, 629 (1st Cir. 1971) (a civil rights action in which the prisoner was not granted a preliminary injunction), the court said, "It may be that prisoners are entitled to receive unopened mail from courts, public officials, and attorneys of record, but appellant must show he would suffer an irreparable injury if prison officials continued to read such incoming mail during the pendency of this law suit." In the *Tyree* case, the court had been assured that although these letters were opened and read, they were delivered promptly; further, the prison officials sent out unopened all letters to the attorney of record.

In another civil rights action, Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971)

(en banc) cert. denied Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed. 2d 254 (1971)[1] (No. 71–246), with respect to letters pertaining to the prisoner's conviction or complaints about the administration of the prison, the prison officials could not delete from letters between a prisoner and any court or agency or lawyer on the grounds that the deleted matter was irrelevant to his complaint, nor could they withhold or refuse to mail such letters on the grounds that they were repetitious, false or malicious.

In Palmigiano v. Travisono, 317 F. Supp. 776 (D.R.I.1970) (the prisoners here were in the awaiting trial section), with respect to outgoing mail, the court in a most enlightening and comprehensive opinion enjoined prison authorities from opening or otherwise inspecting letters between the prisoner and various public officials, his attorney(s) and any other attorneys licensed to practice in R.I. *See* 22 Syr.L.Rev. 818 (1971) and Note, Prison Censorship of Attorney-Client Mail, 22 Baylor L.Rev. 623 (1970). All incoming mail could be opened and inspected except the aforementioned correspondence, which could only be inspected for drugs, weapons, escape instruments and similar items which threatened the safety or security of the prison but "not opened or otherwise inspect[ed]." *Palmigiano, supra*, 317 F. Supp. at 788. The court also held that although private, verbal communication between the prisoner and his attorney was available as an alternative, to require this would dilute effective assistance of counsel and prevent the full effectuation of the Sixth Amendment. In addition, 48 hours were allowed as the maximum period in which to conduct such activities as sorting and verification of sender and receiver of special correspondence.

Yet another civil rights action, McDonough v. Director of Patuxent, 429 F.2d 1189, 1192 (4th Cir. 1970), held

---

1. Although the appeal is pending for this case, the specific issue of the appeal is the question of whether or not a state prison inmate must exhaust state remedies prior to maintaining a federal action under the Civil Rights Act, 42 U.S.C. § 1983. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254.

" 'a right of access to the courts is one of the rights a prisoner clearly retains. It is a precious right, and its administratively unfettered exercise may be of incalculable importance in the protection of rights even more precious.' Coleman v. Peyton, 362 F.2d 905, 907 (4 Cir.), cert. den. 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966). This right, we have recognized, carries with it the right to seek and obtain the assistance of competent counsel so that the assertion of legal claims may be fully effective . . . . (U)ndelayed, uncensored, unlimited use of the mails was necessary to secure the right." But the court expressed concern that this privileged mail not be used for extraneous purposes, in which case it could be suppressed.

Thus, it appears to be a balancing, in the particular circumstances of a case, of the rights of the prisoner to free access to the courts, attorneys, and governmental agencies and the right of the prison officials to carry out their administrative and disciplinary functions without interference from the courts. The courts vary in the balancing of these rights as to the degree of censorship that will be allowed with respect to prisoner-attorney-court mail, some courts not allowing censorship or opening of such mail in the absence of any abuse of this privilege, many courts are more hesitant about applying such a rigid "hands-off" standard to incoming mail. All-in-all no uniformity in new prison rules is evident.

Texas cases, state and federal, present the same extremes. In a Texas Criminal Appeals case, Garcia v. State, 454 S.W.2d 400 (Tex.Cr.App.1970, rehearing denied), opening and reading a confidential letter from an attorney to a prisoner was upheld as in accordance with security regulations and a waiver allowing the prison to read such mail was signed by the prisoner. It was also held that since the attorney was familiar with these regulations, he had alternative means of confidential communication—in direct opposition to the holding of Palmigiano v. Travisono,

*supra. See also* Baker v. Beto, C.A. No. 71–H–345 (S.D.Tex. March 13, 1972). Similarly, one Fifth Circuit case dealing specifically with interference with prisoner-attorney-court mail held that access to the courts did not include the right to send mail relating to legal proceedings by certified mail, postage prepaid, return receipt requested. Schack v. Wainwright, 391 F.2d 608 (5th Cir.), cert. denied, 392 U.S. 915, 88 S.Ct. 2078, 20 L.Ed.2d 1375 (1968).

At the other extreme is the holding of Morales v. Turman, 326 F.Supp. 677, 680 (E.D.Tex.1971), involving a juvenile under the jurisdiction of the Youth Council. The Texas federal court, citing Palmigiano v. Travisono, *supra,* enjoined the defendant from "opening, inspecting, reading, tampering with, copying, delaying or in any manner impeding the passage of incoming or outgoing mails between Plaintiffs and their attorneys."

Other Texas and Fifth Circuit cases lie between these extremes. Perhaps largely due to the fact situations involved, there has been "(G)reat caution when asked to interfere in the internal operation and administration of prisoners". Rocha v. Beto, 449 F.2d 741 (5th Cir. 1971). However, the Fifth Circuit did continue by saying that interference with federally guaranteed rights may not be permitted on the grounds that all regulations within prison walls are protected as necessary to prison administration. Upon considerable reflection of the issues and cases involved, this court finds justification in this record for fewer restrictions in this area because total censorship serves no rational deterrent, rehabilitative or prison security purposes. This court is compelled to adopt the reasoning of the line of cases that prohibit censorship of outgoing mail to the courts, to licensed attorneys (in or out of state), and to state and federal governmental agencies. Marsh v. Moore, 325 F.Supp. 392 (D. Mass.1971). To do otherwise is to interfere with the inmates' rights to redress of their grievances and to effective as-

sistance of counsel. Payne v. Whitmore, 325 F.Supp. 1191 (N.D.Calif.1971). Neither the state nor the prison system itself can allege irreputable injury by letting a prisoner send this type of mail unfettered. *See also* Judge Sara T. Hughes' order in Taylor v. Sterrett, No. CA–3–5220 dated December 13, 1971, in Appendix 1. Certainly it would take less prison personnel and time to let the letters be sent without censorship. The new Texas Department of Corrections Rule 40.2 provides in part for this procedure except it does not include attorneys or governmental agencies within the list of addressees for uncensored mail. The attorney-client privilege is destroyed if censorship of such mail is allowed. Peoples v. Wainright, 325 F. Supp. 402 (S.D.Fla.1971), held that local attorney mail could not be opened but that prisons have and may use technological equipment to do security checks without opening these letters.

In the instant case, this court also includes nonlocal attorneys in the classification of special correspondents for it often happens that Texas prisoners have detainers from other states outstanding against them and need [or are given the constitutional prerogative, *see* Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969)] to consult by mail with out-of-state or nonlocal attorneys. The validity of an out-of-town or out-of-state addressee alleged to be a licensed attorney can be readily checked through bar association journals and surely this country has passed the provencial day when one county, city, or state cannot accept the competency of

another state's licensing agency, e. g., the bars of the various states. The same must be said for including on the special correspondence list all governmental agencies.[2] Another factor in favor of allowing uncensored mail to go out to this group of special correspondents is the fact that the state prison system must assume some faith in the courts and governmental agencies of this country that they are not participating, and will not participate, in illegal schemes. The Texas Department of Corrections must also acknowledge that attorneys and their licensing agencies can police illegal activities at much less cost than the loss of a prisoner's Sixth Amendment right to effective assistance of counsel. Therefore, the Texas Department of Corrections will be enjoined from censoring any mail to those persons listed in Rule 40.2 plus any licensed attorney in any state and any federal or state government agency. Also, all special correspondence shall be unlimited in the volume of pages per letter and the quantity of letters sent. However, it must be emphasized that all prisoner letters and materials, stationery and postage, must be provided exclusively at the prisoner's own expense.

◼ With regard to incoming mail from those persons on the "Special Correspondence" list, i. e., those enumerated in Rule 40.2, they may be opened and read only insofar as to determine if the sender is indeed a "Special Correspondent" and for physical contraband. Smith v. Robbins, 328 F.Supp. 162 (Me.1971).[3] If the letter is re-

---

2. Governmental agencies such as the Office of Social Security and the Veteran's Administration would be examples of special correspondents. These agencies must be included for it must be assumed that a prisoner has the right to assert claims with these governmental bodies for a "prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944).

3. At first blush, this would appear to impose a substantial administrative burden on prison officials. However, the court is confident that new procedures could be established to meet this criteria; for example, the evidence revealed that prison officials at present are the only ones who may give an inmate his mail. Thus, it is conceivable that a procedure similar to the following could be adopted. As the prison official calls a prisoner to receive his mail, the envelope is opened and

jected, the procedure provided for in Rule 40.2111–40.22 will provide a remedy for the inmate.

Now to meet the more thorny questions of the censorship of general mail. The inmates attack the right of the Texas Department of Corrections to set a limit of five persons on an approved correspondence and visiting list. If there were to be no censorship, there would be no need for such limitations on the number of people nor the number of pages in a letter. But if there is a need for blanket censorship, the limited list is a mandatory requirement.

 However, after a thorough review of all the evidence and a balancing of all the institutional needs for safety and orderly prison administration against the emotional release derived by the inmates from expressing by mail their complaints to others or communicating with others, as well as the therapeutic and rehabilitation values coupled with First Amendment freedoms, this court concludes that it is unnecessarily restrictive to censor *outgoing* mail to persons not listed as special correspondents in Rule 40.2. Accordingly, prisoners at their own expense (i. e., postage and stationery) may send uncensored mail to any person. Therefore, the sentence "Inmates shall not try to correspond with anyone who is not on the approved list" is stricken from Rule 40.11 as an unreasonable restraint on the inmates' correspondence. The word "outgoing" will be deleted from Rule 40.19. Because it will be unnecessary to use the prison's personnel time on reading and censoring outgoing mail, Rule 40.14 restricting the length of outgoing mail to one page is, therefore, unreasonable and its enforcement will be enjoined. Likewise, Rule 40.15 is no longer necessary for transmission and handling of the mail and the use of Rule 40.15 is also enjoined.

The court is not unmindful of the possibility of abuse by the prisoners of this extended privilege in mailings. Therefore, if any report is made by a recipient of abusive prison mail to the Texas Department of Corrections, the prison officials shall follow the procedures outlined with regard to the disciplinary committee in the new Rules to investigate the incident and in administering any discipline in regard to that type of mail. However, at no time may such disciplinary action suspend the prisoners' right to write uncensored mail to special correspondents.

 As to incoming general mailings, only persons on the approved mailing list may send letters to inmates. There may be inspection of each piece of such mail for physical contraband or for written escape plots or for the reasons listed in Rule 40.19(b), (d), (e), (f), (g) of the old Regulations promulgated on July 10, 1972; but the vague standard set in (h) of that rule must be stricken. Section (h) of 40.19 reads as follows: "it may contain other information or enclosures which violate the rules or plans to evade the rules set out under this and other sections." Likewise, the phrase "or for reasons not included in the listed sections" must be stricken from Rule 40.211 because of the vagueness it permits in procedural standards. That phrase is a loophole that negates the very theory behind the procedural safeguards that are being established here. Because of personnel time, and prison administrative problems the number of persons permitted to send inmates mail may reasonably be limited to five persons. The prisoner should be present for any inspection of his mail. The same procedure discussed above with regard to special mail could be applied here, i. e., discarding of envelopes and inspection at the time of giving out the mail.

then discarded. The prisoner does not receive the envelope; therefore, any drugs that may have been impregnated in the envelope or its gummed seal will not reach the prisoner. A visual check for drug stains on the stationery could also be readily made at this time. Any weapons would thereby also be exposed.

If the mail is rejected or censored, the inmate may use the procedures of administrative appeal outlined in 40.-2111–40.2114 with the further addendum that the Assistant Director for treatment must act within 72 hours after any discussion by the Warden as referred to in Rule 40.2112; then a 72 hour's maximum delay between the ruling of the Assistant Director for Treatment and the Assistant Director; then another 72 hour's maximum delay between the Assistant Director and the Director; and finally a maximum delay of 72 hours between the ruling of the Director and the appeal to the Texas Board of Corrections' board member responsible for inmate affairs.

 This case also raises the issue as to whether inmates should be allowed to send letters to the news media. It must be noted here that the prisoner's rights are not the only one's affected for the First Amendment rights of all persons or institutions outside the prison are touched by inability of inmates to communicate with the press. "Freedom of the press is, therefore, an important element in this case since freedom to circulate printed material is as essential to freedom of the press as is freedom to publish". Palmigiano v. Travisono, *supra*, 317 F.Supp. at 786. This court wholeheartedly agrees with the well-written opinion of the First Circuit in Nolan v. Fitzpatrick, 451 F. 2d 545 (1st Cir. 1971) and adopts the reasoning there as its own.

"We need not adopt the broad principle that a prisoner retains all First Amendment rights to conclude, as we do, that he retains the right to send letters to the press concerning prison matters. In so concluding, we rely primarily on the fact that the condition of our prisons is an important matter of public policy as to which prisoners are, with their wardens, peculiarly interested and peculiarly knowledgeable. The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear. This does not depend upon a determination that wardens are unsympathetic to the need to improve prison conditions. But even a warden who pushes aggressively for reforms or larger appropriations within his department and before appropriate officials and legislative committees may understandably not feel it prudent to push for more public laundering of institutional linen."

Accordingly, the Texas Department of Corrections will be enjoined from limiting in number or from censoring any outgoing letter to the news media (i. e. press, television, radio). They will, therefore, be included in the Rule 40.2 as special correspondents.

 Petitioner Guajardo and other members of the class have raised the question of the use of an administrative segregation lacking any procedural process whereby an inmate could seek relief from such segregation or at least be apprised of the reason for his segregation. The Fifth Circuit unequivocally stated in Andrade v. Hauck, 452 F.2d 1071 (5th Cir. 1971), that this court has jurisdiction over such allegations. The Texas Department of Corrections in its revised rules has now provided for many commendable procedural safeguards in Chapter V of the rules. However, one vital provision was not made in the new rules (*see* Rule 50.5 et seq.), for the Unit Disciplinary Committee set up to review any disciplinary actions taken could and from the import of Rule 50.7 does include the prison officer who made the initial disciplinary report on the inmate. The procedure whereby one person could be accuser, prosecutor, judge and jury went out of the Anglo-American concept of due process many years ago. *See Urbano, supra*. Therefore, the Unit Disciplinary Committee may not have as a member for that particular case anyone who is the reporting officer in the offense. *See* Bundy v. Can-

non, 328 F.Supp. 165 (D.Maryland 1971). With this one exception, this court finds that the new rules adequately dispose of the petitioners' administrative segregation claims and the court approves the procedures outlined in the new rules.

This court specifically approves the rules covering the issues in question here and warmly compliments the Texas Department of Corrections for its recent efforts at updating the prison rules. It is hoped that these accomplishments will benefit all society.

It is hereby ordered, adjudged and decreed that the following changes be made in the Texas Department of Corrections' Rules and Regulations approved by the Texas Board of Corrections on July 10, 1972:

(1) Except as hereinafter modified Rule 60.88 is specifically approved. At the end of the first sentence of Rule 60.88 the following sentence will be added: "After notification of delay of receipt of any publication and before the presentation of argument to the Review Committee, the inmate will be allowed to review the delayed material in the presence of a prison official."

(2) Except as hereinafter modified Rule 60.87 is specifically approved. Rule 60.87 is modified to read: "An inmate may have four (4) of his personal law books in his cell during any one period *including any period when the inmate is in administrative segregation.*"

(3) Except as hereinafter modified Rule 40.2 is specifically approved. Rule 40.2 is to read as follows: "SPECIAL CORRESPONDENCE Inmates may write sealed and uncensored letters directly to members of the Texas Board of Corrections, the Director of Corrections, the Assistant Director, and the Assistant Director in Charge of Treatment. Sealed and uncensored mail from inmates shall not be opened for inspection or impeded in its transmission if addressed to: any court of the United States or of the State of Texas; any member of the Congress of the United States or any member of the Legislatures of the States of the United States; the President of the United States or the Governors of the States of the United States; the Attorney General of the United States or the Attorney Generals of the States of the United States; the Director or any agent of the Federal Bureau of Investigation or the Director of any Bureau of the Department of Public Safety, State of Texas or other State Police Agencies; any licensed attorney in any state; any federal or state governmental agency; and any television station, radio station, or newspaper."

(4) Rule 40.21 is to read as follows: "The inmate directing mail to any of the aforementioned offices will be required to indicate the nature of the material enclosed on a log kept by the prison to record the flow of mail. If there is any question as to whether an addressee is one of those persons in the above-mentioned, the mail may be held for not more than twenty-four (24) hours to investigate and resolve the question as to the addressee."

(5) Rule 40.211 is hereby stricken from the Rules.

(6) The sentence "Inmates shall not try to correspond with anyone who is not on the approved list." is stricken from Rule 40.11.

(7) Rule 40.19 is to read as follows: "If an incoming letter is rejected, the inmate will be notified and told why. The following are reasons why a letter may be rejected: (a) it may contain threats, imply blackmail and/or extortion, forbidden goods, or information or plots to escape; (b) it may discuss criminal activities; (c) it may contain codes to circumvent understanding of contents; (d) it may contain plots to use overt action to overthrow lawful authority; (e) it may contain solicitation of personal property or funds. Enclosures such as newspaper clippings, and photographs of the inmate or his family which are purely personal are allowed."

(8) Rule 40.14 and Rule 40.15 restricting the length of outgoing mail

and the method of addressing are declared void and of no effect.

(9) The following phrase is hereby added to the beginning of Rule 40.2111: "If incoming mail is rejected by the mail officer,".

(10) The following sentence "Each of these directors will act within 72 hours upon receipt of the claim of rejection." is hereby added to the end of Rule 40.-2113.

(11) The following sentence: "Said Board Members will act within 72 hours of receiving the claim." is hereby added to the end of Rule 40.2114.

(12) The Texas Department of Corrections is enjoined from allowing any officer reporting a disciplinary offense to sit on or be a member of the Disciplinary Committee established in Rule 50.7.

The Texas Department of Corrections is hereby enjoined from following any procedure in conflict with the above outlined principles in regard to mail censorship, correspondence courses, administrative segregation and disciplinary hearings.

## APPENDIX I

United States District Court,
Northern District of Texas,
Dallas Division

Joseph Taylor et al.
v.
W. L. Sterrett et al. } Civil Action No. CA–3–5220.

## ORDER

On the 9th day of December, 1971, came on to be heard Plaintiffs' application for temporary injunction herein; and all parties having appeared by their respective counsel, and said counsel having advised the Court that all parties had agreed that said application would be considered as an application for permanent injunction, the Court proceeded to hear the evidence and argument of counsel, at the conclusion of which the following order is entered:

It is, therefore, ordered, adjudged and decreed that Sheriff Clarence M. Jones, his deputies, servants, and agents are hereby permanently enjoined from censoring or opening mail from inmates of the Dallas County Jail addressed to:

1. Courts;
2. Prosecuting attorneys;
3. Probation and Parole Officers;
4. Governmental Agencies;
5. Lawyers;
6. The press,

and said defendants are further permanently enjoined from censoring or opening mail addressed to inmates from the above-enumerated sources. Except as herein provided, Plaintiffs' application for injunction is otherwise denied.

Entered this 13 day of December, 1971.

[s] Sara T. Hughes
United States District Judge