**Robert MARTINEZ and Wayne Earley et al., Plaintiffs,**

**v.**

**Raymond K. PROCUNIER et al., Defendants.**

**No. C–71 543 ACW.**

United States District Court,
N. D. California.

Feb. 2, 1973.

William Bennett Turner, Lowell Johnston, Julian J. Fowles, Alice Daniel, Hastings College of Law, Mario Obledo, Mexican American Legal Defense & Educational Fund, Inc., San Francisco, Cal., for plaintiffs.

Thomas A. Brady, Edw. A. Hinz, Jr., Doris H. Maier, Robert R. Granucci, Deputy Attys. Gen., San Francisco, Cal., for Evelle J. Younger, Atty. Gen.

Before DUNIWAY, Circuit Judge, and ZIRPOLI and WOLLENBERG, District Judges.

## MEMORANDUM OPINION DENYING DEFENDANTS' MOTION TO DISMISS AND PARTIALLY GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PER CURIAM.

This suit is a class action brought on behalf of all inmates of penal institutions under the jurisdiction of the California Department of Corrections [CDC], challenging certain rules of statewide application relating to mail censorship and attorney-client interviews conducted by law students or other paraprofessionals. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343(3), 1343(4), 2201 and 2281, and 42 U.S.C. § 1983. Plaintiffs seek declaratory and injunctive relief.

The action is presently before the Court on defendants' motion to dismiss for failure to state a claim upon which relief can be granted and plaintiffs' motion for summary judgment. The record before the Court consists of the amended complaint, the moving papers of the parties, affidavits, depositions, interrogatories and admissions.

The amended complaint sets forth five separate claims for relief. Count I alleges that Director's Rules 1201, 1205(d) and (f), and 2402(8) violate the First and Fourteenth Amendments to the United States Constitution insofar as they restrict the permissible content of inmates letters to personal correspondents. Count II alleges that the

rules set forth in Count I and § MV–I–02 of the Director's Mail and Visiting Manual violate the First, Sixth and Fourteenth Amendments as applied to correspondence between inmates and their attorneys. Count III alleges that § MV–IV–02 of the Director's Mail and Visiting Manual violates the Fifth and Fourteenth Amendments by permitting only licensed private investigators and members of the State Bar to interview inmates on behalf of the attorney of record. Count IV alleges that Rule 2402(10) which requires that an inmate obtain permission before sending registered or certified mail violates the First and Fourteenth Amendments. Count V raises an individual claim, alleging abuse of Rule 2402(13) in that plaintiff Martinez was not permitted to correspond with his former co-defendant in order to secure an affidavit he hoped to use in challenging his conviction. The rule itself is not challenged.

Two counts of the complaint need not be considered by this Court. Count V deals only with an alleged abuse in the application of a director's rule; it does not question the validity of the rule itself. Accordingly, the issue is one that should be dealt with by a single judge district court. The second count this Court need not consider is Count IV. At oral argument the Court was informed by counsel for defendants that Director's Rule 2402(10) will be completely omitted from forthcoming revised regulations, and once these regulations are adopted the prisons will not restrict the use of registered and certified mail by prisoners. On the ground that this issue will soon be mooted, defendants asked that the Court not rule upon the validity of the present regulation. The Court, therefore, does not reach this question.

### DEFENDANTS' MOTION TO DISMISS

■ In addition to the somewhat more specific arguments addressed to each count of the complaint, defendants raise two basic contentions in support of their motion to dismiss. First, they contend that the claims raised in the complaint involve questions of internal prison administration over which correctional authorities traditionally have wide discretion. Smith v. Schneckloth, 414 F.2d 680, 681 (9th Cir. 1969). The Supreme Court responded to a similar contention in Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969):

> "There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated."

*Accord,* Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Hence, in alleging violations of inmates rights under the First, Fifth and Fourteenth Amendments, plaintiffs have stated a claim that this Court must consider.

Defendants' second contention is that even if jurisdiction is proper and a claim cognizable in federal court has been alleged, the Court should nevertheless abstain. Defendants admit that exhaustion of state remedies is not required under 42 U.S.C. § 1983, but suggest that since equitable relief has been requested, the Court should defer to the California courts on the basis of comity. Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970).

■ In Lake Carrier's Ass'n v. MacMullan, 406 U.S. 498, 509–510, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), the Supreme Court, as it had done before, specifically rejected the argument that the possibility a state court suit might result in a law being declared unconstitutional is not grounds for abstaining. Rather, abstention is proper only in the "narrowly limited 'special circumstances'" that exist when the state law

could be interpreted in a manner that would render it constitutional. *Id.*, Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1971). "Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971).

Finally, defendants argue that regardless of the validity of the motion to dismiss the other claims, Count II must be dismissed, because the question raised was resolved in In re Jordan, 7 Cal.3d 930, 103 Cal.Rptr. 849, 500 P.2d 873 (1972). The question raised is, as defendants argue, now moot, and defendants' motion to dismiss Count II is, therefore, granted.

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT: COUNT I

Plaintiffs challenge the following Director's Rules as infringing on their freedom of speech: Rule 1201 directs inmates not to "agitate, unduly complain, magnify grievances, or behave in any way which might lead to violence."[1] Rules 1205(d) and (f) define contraband, as "any writings . . . expressing inflammatory political, racial, religious, or other views or beliefs . . . . which if circulated among other inmates, would in the judgment of the warden or superintendent tend to subvert prison order or discipline."[2] Rule 2402(8) provides that inmates "may not send or receive letters that pertain to criminal activity; are lewd, obscene, or defamatory; contain foreign matter, or are otherwise inappropriate." [3]

These rules implement CDC's general policy towards prisoner mail, which is set forth in Rule 2401:

"The sending and receiving of mail is a privilege, not a right, and any violation of the rules governing mail privileges either by you or by your correspondents may cause suspension of the mail privileges."

The rules are enforced by mailroom staff and other employees of the prison who routinely read incoming and outgoing "personal"[4] mail of prisoners.

No standards, other than those contained in the rules set forth above, are furnished to the mailroom staff to help them decide whether a particular letter violates any prison rule or policy. If a letter is found to be improper correspondence, a CDC employee may take one or more of the following actions: (a) he may refuse to mail the letter and return

1. D1201. INMATE BEHAVIOR. Always conduct yourself in an orderly manner. Do not fight or take part in horseplay or physical encounters except as part of the regular athletic program. Do not agitate, unduly complain, magnify grievances, or behave in any way which might lead to violence.

2. Rule D1205, Contraband, is revised as follows: . . .
   d. Any writings or voice recordings expressing inflammatory political, racial, religious or other views or beliefs when not in the immediate possession of the originator, or when the originator's possession is used to subvert prison discipline by display or circulation. . . .
   f. Any writings or voice recordings constituting escape plans or plans for the production or acquisition of explosives or arms, possession of which is forbidden by law to inmates of institutions under the control of the Department of Corrections. Such material as may be contained in books, magazines, or newspapers which have been previously approved for receipt by inmates is excepted.
   There is some indication that the definition of contraband will be changed in revised regulations to emphasize the purpose for which an item may be used, such as a weapon or escape plan, instead of retaining the present general description. See Procunier Deposition at 12.

3. Rule 2402(8) has been altered since the amended complaint was filed. The present prohibition against "foreign matter" replaces a prohibition against "prison gossip or discussion of other inmates."

4. For purposes of this opinion, "personal" mail is defined to be all mail other than correspondence with "any member of the State Bar, or holder of public office". Cal.Penal Code § 2600(2).

it to the prisoner; (b) he may submit a disciplinary report, which may lead to suspension of the prisoner's mail privileges or to other, possibly more severe disciplinary punishment; or, (c) he may photocopy the letter and place it in the prisoner's permanent file where it will be available to classification committees, which determine housing and work assignments, and to the Adult Authority, which sets a date for the prisoner's parole eligibility.

Plaintiffs raise several challenges to these regulations, all based on the First Amendment. Before discussing them, however, it is appropriate to examine the applicability of First Amendment rights to prison inmates in more general terms. The majority of recent cases treating the problem have adopted the formulation of the court in Carothers v. Follette, 314 F.Supp. 1014, 1024 (S.D. N.Y.1970): "[A]ny prison regulation or practice which restricts the right of free expression that a prisoner would have enjoyed if he had not been imprisoned must be related both reasonably [citations omitted] and necessarily [citations omitted] to the advancement of some justifiable purpose of imprisonment." See Gray v. Creamer, 465 F.2d 179, 186 (3d Cir. 1972); Wilkinson v. Skinner, 462 F.2d 670, 671 (2d Cir. 1972); Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); Barnett v. Rodgers, 133 U.S. App.D.C. 296, 410 F.2d 995, 1000 (D.C. Cir. 1969); Jackson v. Godwin, 400 F.2d 529, 541 (5th Cir. 1968); Gates v. Collier, 349 F.Supp. 881, 896 (N.D.Miss. 1972); Palmigiano v. Travisono, 317 F. Supp. 776, 785 (D.R.I. 1970)); cf. Guajardo v. McAdams, 349 F.Supp. 211 (S.D. Tex.1972); Brenneman v. Madigan, 343 F.Supp. 128, 141–142 (N.D. Cal. 1972);

Burnham v. Oswald, 342 F.Supp. 880 (W.D. N.Y. 1972); Hillery v. Procunier, C–71 2150 SW (N.D. Cal. 1972) (judgment vacated and temporary restraining order granted pending decision by three-judge court October 31, 1972); Note: Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87 (1971). A few courts have required that the state show a compelling interest. See, e. g., Morales v. Schmidt, 340 F.Supp. 544 (W.D. Wis. 1972); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D. N.Y. 1970). But see Baker v. Beto, 349 F.Supp. 1263 (S.D. Tex. 1972). This Court need not decide between the "compelling" and "reasonable and necessary" tests since it holds that the regulations in question violate the First Amendment under either standard.

█ Plaintiffs correctly assert that the regulations in question are deficient in several respects. The regulations permit censoring of lawful expressions without any apparent justification. Phrases such as "defamatory", "otherwise inappropriate", "unduly complain", and "magnify grievances", include writings which are not obscene and do not present a clear and present danger to any justifiable state interest. Such writings are, therefore, protected by the First Amendment. No conceivable justification on the grounds of prison security necessarily requires such broad formulation of censorship standards. Nor does it appear that defendant's legitimate interest in preserving internal discipline is served by applying these criteria to incoming mail.[5]

█ Moreover, assuming that the requirements of prison security justify censoring outgoing mail in some circumstances,[6] the regulations in ques-

---

5. Defendant does not raise other potential justifications based on the recognized functions of prisons in America—deterence of the individual and others from committing criminal acts, and rehabilitation of the individual. See Morales v. Schmidt, supra, 340 F.Supp. at 550. Such an argument would be futile, in any event, since the regulations in question would not appear

necessary to further any of these functions.

6. Guajardo v. McAdams, 349 F.Supp. 211 (S.D. Tex. 1972); Lamar v. Kern, 349 F. Supp. 222 (S.D. Tex. 1972); and Morales v. Schmidt, 340 F.Supp. 544 (W.D. Wis. 1972), have held that the state has no justifiable interest in censoring outgoing personal mail of inmates.

tion here are both vague and overbroad. Legitimate communications, though personally offensive to prison staff could be—and have been—censored on the grounds that statements in letters were "defamatory", or "otherwise inappropriate", or that they constitute undue complaints or magnified grievances. If censorship of outgoing personal mail is to continue, the regulations must be more narrowly and specifically drawn to prohibit only such communications as are obscene, and therefore not protected by the First Amendment, or as constitute a clear and present danger to the institution or its rehabilitation programs. Statements critical of prison life and personnel cannot be subject to censorship by the very people who are being criticized, simply to stifle such criticism.

■ Plaintiffs further contend that the regulations in question are unconstitutional because they authorize punishment without giving "fair notice" of what is prohibited. See Landman v. Royster, 333 F.Supp. 621, 654–656 (E. D. Va. 1971). The punishment involved may include suspension of the right to send and receive personal mail, loss of privileges, or even a term in solitary confinement. The Court agrees with this contention as well.

■■ Plaintiffs' final contention is that the Director's Rules do not provide any procedural safeguards against violation of prisoners' First Amendment rights through error or arbitrariness in censoring mail. The absence of safeguards undoubtedly stems from the premise of the mail regulations—mail is a privilege, not a fundamental right. Since we hold that prisoners' right to correspond is a fundamental right protected by the First Amendment, and

that restrictions on that right must be at least reasonably and necessarily related to a valid institutional interest, it follows that any regulations restricting prisoners' mail must be accompanied by the opportunity for review of decisions to censor or withhold mail. *See* Guajardo v. McAdams, *supra*. Without limiting the scope of such regulations, the following should, at a minimum, be provided for: (1) notice to the inmate that a letter has been disapproved, whether the letter be incoming or outgoing; (2) a reasonable opportunity for the inmate to contest a decision disapproving of an outgoing letter, and for an inmate's correspondent to contest a similar decision on an incoming letter; (3) review of complaints arising from censorship by an official of the prison other than the person who initially decided to disapprove a letter.

### COUNT III

Administrative Rule MV–IV–02 provides in pertinent part:

> Investigators for an attorney-of-record will be confined to not more than two. Such investigators must be licensed by the State or must be members of the State Bar. Designation must be made in writing by the Attorney.

Plaintiffs contend that this regulation effectively impedes access to the courts by imposing an unnecessary burden on prison inmates who cannot afford to pay for the services of licensed private investigators or attorneys. Most inmates are indigent and cannot even afford to pay their attorneys of record.[7] Yet interviewing inmates is frequently an essential part of understanding the basis for a civil rights complaint, a habeas corpus petition, or an appeal. Stevenson

---

7. "While the demand for legal counsel in prison is heavy, the supply is light. For private matters of a civil nature, legal counsel for the indigent in prison is almost nonexistent. Even for criminal proceedings, it is sparse." Johnson v. Avery, 393 U.S. 483, 493, 89 S.Ct. 747, 753, 21 L.Ed.2d 718 (1969) (Douglas, J., concurring) (footnote omitted). *Cf.* In re Tucker, 5 Cal.3d 171, 183, 95 Cal.Rptr. 761, 486 P.2d 657 (1971); Jacob & Sharma, Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process, 18 Kan.L.Rev. 493 (1970).

v. Mancusi, 325 F.Supp. 1028, 1032 (W. D. N.Y. 1971). If attorneys of record must interview their clients personally at the many CDC institutions, the time spent travelling would necessarily prohibit them from spending as much time working on legal problems.

Conversely, if attorneys can send assistants with detailed instructions to interview inmates, they will have more time available to evaluate the contentions raised and prepare the necessary legal documents. It follows that each inmate-client will receive better legal assistance, thus facilitating his access to the courts. Moreover, attorneys would have more time to serve additional clients who might otherwise have to rely on jailhouse lawyers.

The potential benefits to inmates, attorneys and the courts from permitting attorneys to send law students or other paraprofessionals to interview inmates are obvious. The use of paraprofessionals throughout the profession is becoming recognized as a means of improving legal services. The American Bar Association for example, recognizes such procedures in its new Code of Professional Responsibility.[8]

■■ The fact that use of paraprofessionals would be beneficial, and perhaps essential in the prison context, to assuring an inmate reasonable access to the courts does not, however, provide a sufficient understanding of the problem to determine whether MV–IV–02 is constitutional. This Court has expressed the view that "prison rules must pass the basic test of due process reasonability, with that test being more or less stringent according to the character of the right taken from the prisoner." Gilmore v. Lynch, 319 F.Supp. 105, 109 n. 6 (N.D. Cal. 1970), aff'd sub nom. Young-

er v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). The Supreme Court of California has similarly held that "the proper determination of [whether a given restriction is constitutional] in a particular case requires that we measure the *extent* of restriction against the *need* for restriction." In re Harrell, 2 Cal.3d 675, 686, 87 Cal.Rptr. 504, 510, 470 P.2d 640 (1970). Factual criteria to be examined in making this determination are (1) the extent to which application of the rule impedes access to the court; (2) the extent of the threat presented by the conduct sought to be avoided by the particular rule from the standpoint of legitimate custodial objectives, and (3) the existence of reasonable alternative means of limiting the undesirable conduct which do ·not entail so significant a restriction on access to the courts. In re Harrell, *supra.*

■ The uncontested affidavit of Alice Daniel establishes that Rule MV–IV–02 and the remoteness of most CDC institutions makes personal visits to inmate-clients *so time consuming and inconvenient* that attorneys are reluctant to make such visits. Inability to interview a client conveniently may affect an attorney's decision not to take the case, especially if the inmate is indigent and cannot pay for the attorney's expenses or time in making personal visits. When such a decision occurs, the inmate's ability to present his case to the court necessarily suffers substantially from the absence of professional representation.

The conduct sought to be avoided by the adoption of MV–IV–02 in the fall of 1971 was visits to inmates by unlicensed investigators who posed a threat to prison security. Director Procunier testified in his deposition that "the real

8. "A lawyer often delegates tasks to clerks, secretaries, and other lay persons. Such delegation is proper if the lawyer maintains a direct relationship with his client, supervises the delegated work and has complete professional responsibility for the work product. This delegation enables a lawyer to render legal services more eco-

nomically and efficiently." Canon 3, Ethical Considerations 3–6. *See also* Brickman, Expansion of the Lawyering Process Through a New Delivery System: The Emergence and State of Legal Paraprofessionalism, 71 Colum.L.Rev. 1153 (1971).

threat to security was that we were having visits from any one attorney [sic] that designated some people that we chose not to have in our institutions. That was generally the cause we found, that with some firms, they would designate anybody to be an investigator to get them in, people that we wouldn't allow in the institutions, so we tried to correct that and still be reasonable. The only way we could control it in my judgment would be to have them be licensed investigators." (Procunier Deposition, 24–25)

The Director's interest in preventing "undesirable" people from visiting inmates appears to be a reasonable concern for preserving prison security. But the means chosen to protect that interest are overbroad. In the present case, Ms. Daniel attempted to have a Hastings law student interview her client on her behalf, but was refused permission. Had the law student been participating in any of a number of law school programs under which students help inmates with their legal problems, instead of assisting a practicing attorney, he would have been permitted to interview the plaintiff. Moreover, he would not have undergone a security check other than to assure that he was enrolled in a school program.

In view of CDC's ability to satisfy security needs and still allow many law students access to inmates, it is apparent that a less restrictive regulation can be drawn to govern attorneys' use of law students or other paraprofessionals. Without intending to limit the Department's ability to experiment, the Court might suggest that bona fide law students under the supervision of attorneys, or full time lay employees of attorneys would constitute a reasonable group of potential investigators.

### JUDGMENT

In accordance with Rule 56, Federal Rules of Civil Procedure, the Court adopts the foregoing opinion as its findings of fact and conclusions of law. It is the judgment of this Court that CDC Director's Rules 1201, 1205(d) and (f) and 2402(8) violate the First and Fourteenth Amendments to the Constitution. Rule MV–IV–02 violates the Fifth and Fourteenth Amendments. The Court therefore enjoins enforcement of these regulations insofar as they pertain to inmate mail and investigative interviews with qualified assistants of licensed attorneys.

The Court further orders that the defendants formulate new regulations in accordance with this opinion, and serve said regulations on plaintiffs' counsel and file them with the Court on or before March 1, 1973. Plaintiffs shall have until March 15, 1973 to respond to the proposed new regulations. The Court reserves jurisdiction of this lawsuit until properly formulated regulations have been adopted.

It is further ordered that Count II is dismissed as moot, and Count V be remanded to a single judge of this Court.